**L'ENFANT PLAZA NORTH, INC., et al.,
Plaintiffs,**

v.

**DISTRICT OF COLUMBIA REDEVEL-
OPMENT LAND AGENCY et al.,
Defendants.**

**Civ. A. No. 1533–68.**

United States District Court,
District of Columbia.

May 22, 1972.

---

pleadings, exhibits and affidavits filed in the cause and having considered the argument of counsel for the parties made in open court, makes the following findings of fact and conclusions of law.

### Findings of Fact

1. The original plaintiffs are seven corporations and two partnerships owning real estate or tenants under long-term leases of real estate with improvements commonly known as L'Enfant Plaza, The Reporters Building, Town Center and other related buildings and improvements located in what is known as the Southwest Urban Renewal Area C. Plaintiffs permitted to intervene in this action are lessees of space in L'Enfant Plaza who operate retail commercial businesses.

2. Defendants are the District of Columbia Land Redevelopment Agency (hereinafter "RLA") and its chairman, the National Capital Planning Commission (hereinafter "NCPC") and its chairman, the District of Columbia and Walter E. Washington. David Nassif Associates (hereinafter "Nassif") was allowed to intervene as a party defendant.

3. The Urban Renewal Plan for Southwest Urban Renewal Area Project "C" (hereinafter "the Plan") was adopted by defendant NCPC on April 5, 1956, and approved by the Board of Commissioners of the District of Columbia on November 30, 1956.

4. Square 465, which is bounded by D Street, S.W., 6th Street, S.W., 7th Street, S.W., and E Street, S.W., was, at this time, designated for two land uses —the western portion to be part of the proposed L'Enfant Plaza and the eastern portion dedicated to church purposes.

5. In February, 1962, the General Services Administration (hereinafter "GSA") solicited bids for one million square feet of office space in the metropolitan Washington, D. C., area (PBS Bid No. 03564). The solicitation required the bidder to provide an employee restaurant of 29,000 square feet and approximately 200 parking spaces. At

Kenneth Wells Parkinson, Daggett H. Howard, Henry Roemer McPhee, Washington, D. C., for plaintiffs.

E. Tillman Stirling, William Schweitzer, Asst. U. S. Atty., A. Robert Singer, Asst. Corp. Counsel, Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

This cause having come on for hearing upon plaintiff's request for a declaratory judgment and injunctive relief after remand by the Court of Appeals and the Court, having considered the

that time, the general policy of GSA concerning commercial space in a building leased by the government was to allow the lessor to devote the first floor area or below to commercial space. The February, 1962 bid invitation recognized that commercial space could be included and specifically so stated in Section 6(b)(1) of the bid. Five addenda were added to this bid invitation but they are not pertinent to this discussion.

6. In specific response to GSA's invitation for bids, Webb & Knapp, Inc., (hereinafter "Webb & Knapp") one of the early developers of Southwest Area Project "C", requested that the Plan be changed so that they could erect a building on Square 465 which would conform to the GSA invitation to bid.

7. At the behest of Webb & Knapp, I. M. Pei Associates (hereinafter "I. M. Pei"), an architectural firm, in May, 1962, prepared and submitted plans for a building on Square 465 which would fulfill the requirements of the GSA bid invitation. In drawing the plans and designating the area for retail uses for the building on the proposed Square 465, I. M. Pei followed the directives of Webb & Knapp, which were based on Webb & Knapp's determination of the amount of retail space which could be supported by the people who would work in the building. A set of nine drawings were completed by I. M. Pei under the direction of Mr. Araldo Cossutta. The ground floor drawing contains a note as follows: "Note: 14,000 square feet of ground floor area reserved for commercial use in mutually agreed upon manner." Mr. Cossutta testified that the purpose of this note was to alert the RLA and the Planning Commission to the desirability of having certain auxiliary uses in the building, and secondly to suggest the number of square feet which would in a general sense be representative of such use.

8. During the course of conferences with RLA officials, Webb & Knapp suggested that the 14,000 square feet of commercial space on the ground floor of the building be increased to 100,000 square feet. RLA insisted that the building be dedicated to office use and steadfastly refused this request. Indeed, RLA never actually approved Webb & Knapp's initial suggestion that 14,000 square feet be allowed for commercial space.

9. Nevertheless, modification of the Plan with respect to the land controls applicable to Square 465 was initiated. The original draft of such proposed modification provided as follows:

"(1) *Uses.* In Square 465, as indicated on Land Use Plan, all buildings and premises shall be used for governmental, professional or commercial offices including such incidental uses as cafeterias and off-street parking and loading areas which are necessary to serve the principal uses."

10. The first draft of the proposed modification was revised and the final form of the land controls for Square 465 was adopted by NCPC on October 25, 1962, and approved by the District's Board of Commissioners on July 25, 1963, as follows (Section H.4.e of Plan):

"(1) *Uses.* In Square 465 as indicated on Land Use Plan, all buildings and premises shall be limited to offices for governmental, professional, institutional or commercial uses and accessory uses such as employee restaurants and off-street parking necessary to serve the primary uses."

11. The testimony of Charles Hanke of the NCPC before an open session of that body on October 25, 1962, at which time the NCPC adopted the modification, provides an explanation for the modification:

"The Fifth change involves the designation of all of Square 465 as limited first commercial. At the present time the eastern half of the square is shown as semi-public for it was intended that a school for St. Dominics and the Fifth Baptist Church would be located in that area. They are both now relocated and the Square will become limited first commercial.

"The next chage [sic] is on page 31, where a section has been added, a ditto sheet, to control the development of Square 465 which, under the old plan, was part of the Plaza area.

"It is no longer defined as Plaza area so separate controls parallel with this have been established, which are identical to the controls now on that square in the present plan and this will be paragraph F on page 31."

12. A memorandum of the action of the NCPC dated November 20, 1962, provides:

"eliminating the Fifth Baptist Church from the list of properties not to be acquired . . . will make it possible to acquire the church and make Square 465 available for the construction of an office building needed by, and to be leased to, the General Services Administration."

and further that:

"This will enable the block to be used for a proposed large office building."

13. The District of Columbia published a legal notice dated December 20, 1962, of a public hearing to be held on January 28, 1963, before the Board of Commissioners to consider the proposed modification of the Plan. The notice stated that the proposed modification would include, among other things, the following:

"*Of the Text.*—Provision for the 5th Baptist Church to be acquired, for increased density of dwelling units north of M Street, for use and building requirements applicable to Square 465 which is changed to an office building site, changes certain building and parking requirements for the 10th Street Plaza Area, changes in the requirements for sites used as off-street parking facilities to extend them to additional sites."

14. In addition to the land controls applicable to Square 465, Section 4 of the Plan entitled "Limited First Commercial Areas," provides for land use controls on various sites throughout the Southwest Redevelopment Area, including Town Center, the Waterfront, the L'Enfant Plaza Area, Squares 463 and S–463, and Square 465.

(a) With respect to Town Center, the Plan provides (4 a 1):

*"Permitted Uses.*

"In this area, all buildings and premises shall be limited to the following uses:

"(a) Retail and personal services establishments which provide for the day-to-day needs of the tributary residential area, such as: Drug stores, banks, food stores, liquor stores, barber shops, beauty shops, cleaners, restaurants, variety stores, drygoods stores, postal station, branch library, filling station (limited to the sale of petroleum products and not including lubrication or other related services), and other usual and necessary neighborhood shopping and service establishments."

Thus, the Plan with respect to Town Center specifies in detail the retail commercial uses for buildings in that area.

(b) With respect to the Waterfront, the Plan provides (4 b 2) that the permitted uses on sites A, F, E, B–1, C–2, B–2, C–1, C–3, D–1, and D–2, shall be for such uses as marina and marine stores, boat launching facilities, boat sales, yacht clubs, restaurants, retail sea food and "other retail, office and service establishments related to Waterfront activities." Thus, in connection with the Waterfront, the Plan permits retail commercial uses by specific identification, such as "restaurant," "retail sea food" or by reference to "retail" establishments "related to waterfront activities." It is interesting to note that, with respect to sites A and E, B–1, C–2, B–2, C–1, C–3, D–1 and D–2, and Site F, the Plan (4 b 2) provides that these sites may have, in addition to the enumerated uses, "accessory uses necessary to permitted uses, including service drives, parking and loading spaces." These terms are repeated five times, with repeated modification of "accessory uses" by the term "necessary."

(c) With respect to the Plaza, now known as L'Enfant Plaza, the Plan provides (4 c 1):

*"Permitted Uses.*

"The permitted land uses and uses of buildings in the Plaza area shall be cultural, recreational, educational, tourist and limited commercial appropriate to the National Capital. Such uses may be public or semi-public and may include auditoria, convention halls, broadcasting studios, exhibition halls, public information centers, museums, hotels, . . . Professional schools (not including trade schools) and other uses similar to, compatible with, or necessary to serve the uses enumerated in this section, including other uses permitted in a First Commercial 'C' area district of the Zoning Regulations, except department stores, dwelling units (except in hotels or for custodial purposes), general clothing stores and general retail food stores and those prohibitions stated in said Zoning Regulations."

The Zoning Regulations referred to in the Plan are the Zoning Regulations of the District of Columbia, dated September, 1953, as amended and in effect on April 5, 1956, the date of the initial adoption of the Plan by the Planning Commission "irrespective of any modification or repeal" of the regulations. That section of the Zoning Regulations permits a full range of commercial uses, with certain exceptions not pertinent here, in the following language:

"SECTION IV—FIRST COMMERCIAL DISTRICT

"In the first commercial district all buildings and premises, except as otherwise provides in these Regulations, may be used for any use permitted in the residential district or for any other use except . . . . "

Thus, the Plan specifically permits retail commercial uses in the Plaza area by special reference to the Zoning Regulations of the District of Columbia.

(d) With respect to Squares 463 and S–463 (H 4 d), the Plan provides:

*"(1) Uses.*

"In Square 463 and S–463, as indicated on the Land Use Plan, land and buildings shall be limited to general office use; off-street parking; and retail and personal service establishments for the day-to-day needs of the population of the immediate vicinity, such as art objects, bank, barber or beauty shop, books, phonograph records, cameras, optical goods, china, glassware, silver, cosmetics, toiletries, drugs, sundries, flowers, plants, gifts, cards, stationery, hobby supplies, toys, food, groceries, jewelry, watch repair, laundry and cleaning collection, leather goods, cutlery, packaged liquors, photo studio, restaurant, ticket office, tobacconist, valet shop, and wearing apparel and accessories."

Thus, the Plan permits a full range of retail commercial uses on Squares 463 and S–463 by specifically identifying these retail uses.

15. As already noted, with respect to Square 465 (H 4 e), the Plan provides merely that:

"All buildings and premises shall be limited to offices for governmental, professional, institutional or commercial use, and accessory uses such as employee restaurants and off-street parking necessary to serve the primary uses."

The drafters of the Plan with reference to the land use controls for Square 465 did not use the word "retail" as it is to be found in the sections of the Plan devoted to uses for Town Center (H 4 a), Squares 463 and S–463, and the Waterfront (H 4 b). The drafters did not recite a list of retail commercial uses suitable for Square 465 as they did with respect to the permitted uses on Town Center for (H 4 a), the Waterfront (H 4 b), or Squares 463 and S–463 (H 4 d). Furthermore, the drafters of the land use controls for Square 465 did not specifically include the uses permitted in the First Commercial "C" District of the Zoning Regulations as they did in the permitted uses section of the plan

for the "Plaza" area (H 4 c). Instead, it was determined that on Square 465 "all buildings and premises shall be limited to" the specified uses.

16. It is clear that where the drafters of the Plan intended to permit retail commercial uses, the uses were expressed and clearly enumerated. It is abundantly clear that the land use controls with respect to Square 465 are stricter and more limiting than those for any other site in the limited First Commercial Section of the Plan. The land use controls are more stringent for Square 465 than for Town Center, the Waterfront, the Plaza, and Squares 463 and. S–463.

■ 17. The "office" use contemplated as a primary use under the Plan for Square 465 does not authorize offices for banks, savings and loan associations, stock brokerage offices, barber shops, beauty salons, optometrists, ticket agencies and health facilities. When these uses are permitted elsewhere in the Plan, they fall under the category of "personal service establishments" in the phrase "retail and personal service establishments." "Personal services establishments" must be distinguished from general office use for "governmental, professional, institutional, or commercial use" which is permitted on Square 465 as a primary use.

18. The basic purpose of the Plan is to provide for retail commercial uses at certain designated locations, of which Square 465 is not one. The Plan does not contemplate that every parcel in the project area is to be self-contained, in terms of retail commercial facilities. Instead, the office population of areas such as Square 465 is expected to provide a large portion of the market for nearby retail commercial areas such as L'Enfant Plaza, Squares 463 and S–463, and Town Center.

19. Although the Plan change as to Square 465 took place as indicated, effective July 25, 1963, Webb & Knapp, because of financial difficulties, was never able to develop Square 465.

20. Two other firms did take an interest in the development of Square 465, plaintiffs Bresler & Reiner and L'Enfant Plaza Corporations. These plaintiffs, and especially the latter, met with RLA on thirty or more occasions during 1964 and 1965 to consider their assuming Webb & Knapp's role in the development of the Southwest Urban Renewal Area C. During these conferences, the Plan's land use restrictions for this area were thoroughly discussed. RLA officials made it clear that Square 463 and S–463 were the only two parcels other than the Plaza area, upon which broad commercial uses were permitted under the Plan. RLA pointed out that Square 465, having very limited commercial uses, would create an office population which could patronize the commercial establishments permitted and developed in these neighboring squares. Following these conferences, and relying on RLA's representations as to the land controls applicable to Square 465 as compared with other parcels in the Renewal Area, plaintiffs acquired and developed their respective parcels. Neither assumed responsibility for the development of Square 465.

21. Lacking a developer for Square 465, RLA issued a solicitation for sale of Square 465 in January, 1965, and in February RLA placed advertisements in the Wall Street Journal, the Washington Evening Star, the Washington Post, and the Washington Daily News soliciting offers for Square 465 as "commercial land" and "a limited first commercial site."

22. In connection with the solicitation for sale, defendant RLA had a land appraisal performed by Anthony Reynolds, an independent appraiser. Mr. Reynolds determined that the highest and best use in accordance with the Plan would be an office building with the ground floor leased for a range of retail commercial uses consisting of: "two restaurants, a first aid room, a barber shop, a beauty salon, a credit union, a savings and loan association, a news and magazine stand, a confectionary stand,

etc." He analyzed the value of Square 465 on the basis of 90,000 square feet of retail use in the building.

23. On April 21, 1966, defendant-intervenor Nassif, in response to defendant RLA's solicitation, submitted an offer to purchase Square 465 with the intention of constructing an office building with retail commercial uses on the ground floor.

24. Defendant RLA held a public hearing on defendant-intervenor Nassif's proposal on September 6, 1967. In connection with the public hearing defendant RLA announced that defendant-intervenor Nassif planned to construct an office building which would contain a little more than a million square feet of office space and 70,000 square feet of retail commercial space.

25. In November, 1967, plaintiffs, in correspondence and in conferences, protested to defendant RLA that such retail commercial uses proposed by defendant-intervenor Nassif for Square 465 were not permitted by the Plan.

26. In January, 1968, defendant RLA requested Anthony Reynolds, the consultant who had written the appraisal report in 1965, to provide a list of the permissible retail commercial uses to which Square 465 might be devoted. Mr. Reynolds enumerated an extensive list of allegedly permissible uses.

27. At about the same time, January, 1968, defendant-intervenor Nassif had a similar report prepared by another consultant, Robert Gladstone & Associates. The Gladstone report listed numerous allegedly acceptable retail commercial uses.

28. Following a request by defendant RLA, defendant-intervenor Nassif in a letter dated January 30, 1968, submitted a list of retail commercial uses which it proposed as applicable in the leasing space in its building on Square 465. Defendant-intervenor Nassif proposed uses and allocated space to each use as follows:

| | Types of Uses | Space Allocated (Square Feet) |
|---|---|---|
| 1. | Restaurant | 10,165 |
| 2. | Cafeteria | 25,000 |
| 3. | Drug Store's Food Service | 4,500 |
| 4. | Drug Store's Excluding Food Service Area | 8,500 |
| 5. | Package Goods Store | 1,500 |
| 6. | Gift Shop | 1,000 |
| 7. | Women's Specialty Shop | 1,500 |
| 8. | Men's Specialty Shop | 1,500 |
| 9. | Camera, Photographic Supplies | 900 |
| 10. | Candy Store | 900 |
| 11. | Florist | 900 |
| 12. | Jewelry | 900 |
| 13. | Books & Stationery | 2,000 |
| 14. | Office Supplies, Furniture, Equipment & Related Services | 7,000 |
| 15. | Barber Shop | 500 |
| 16. | Beauty Salon | 1,500 |
| 17. | Valet, Laundry, Dry Cleaning, etc. | 900 |
| 18. | Optometrist | 500 |
| 19. | Watch Repair | 500 |
| 20. | Ticket Agency | 900 |
| 21. | Travel Agency | 900 |
| 22. | Health Facility | 1,500 |
| 23. | Bank | 5,000 |
| 24. | Savings & Loan Association | 2,000 |
| 25. | Stock Brokerage | 1,500 |
| 26. | Auto Rental Agency | 500 |
| 27. | Post Office | 2,000 |
| | | 84,465 |

29. In February, 1968, defendant RLA issued a legal opinion as to the proper application of Section H 4 e of the Plan to the retail commercial uses proposed by defendant-intervenor Nassif.

30. On May 1, 1968, a letter signed by the Chairman of the Board of defendant RLA and approved by the Board of Directors was sent to Daggett Howard, attorney for plaintiff L'Enfant Plaza Corporations. The letter advised plaintiffs that all uses proposed by defendant-intervenor Nassif except the office furniture operation and the liquor store were acceptable.

31. On June 20, 1968, plaintiffs instituted the instant suit.

*Conclusions of Law*

1. The case is before the Court upon remand by the United States Court of Appeals for the District of Columbia for further proceedings consistent with its opinion in L'Enfant Plaza North, Inc. v. District of Columbia Redevelopment Land Agency, 141 U.S.App.D.C. 265, 437 F.2d 698 (1970).

■ 2. Section H 4 e of the Urban Renewal Plan for the Southwest Urban Renewal Area, Project C, provides:

"In Square 465, as indicated on the Land Use Plan, all buildings and premises shall be limited to offices for governmental, professional, institutional or commercial use, and accessory uses such as employee restaurants and off-street parking necessary to serve the primary uses."

This language, read by itself, makes it clear that Square 465 was designed to accommodate an office building, and that the offices therein are to serve activities which are to be either governmental, professional, institutional or commercial office uses. This office use was the only primary use of the site; no mention is made whatsoever of any store or commercial retailing use as primary use. Accessory use for the site is limited to "accessory uses . . . necessary to serve the primary uses." The clause "necessary to serve the primary uses" modifies and restricts the term "accessory uses." The phrase, "such as employee restaurants and off-street parking," further prescribes the nature of the permitted accessory uses. Thus, the only reasonable meaning to be given the term "accessory uses," as so modified and restricted, is that it would permit employee restaurants and off-street parking, and other like uses, but only insofar as necessary to serve the occupants and their visitors in the office building. The broad range of retail uses which RLA would permit in Square 465 are not such "like uses."

3. This construction of Section H 4 e of the Urban Renewal Plan is supported by reference to the legislative history of the Plan and by reference to the context of the entire Plan, which specifies with particularity a broad range of retail commercial uses for the L'Enfant Plaza Area, Town Center, Waterfront and Squares 463 and S–463, which areas are close to Square 465.

4. Accordingly, the permitted accessory uses of the property located in Square 465, according to the Urban Renewal Plan applicable thereto, are limited to restaurants, dining rooms, cafeterias, snack bars, carryouts, food cart service, food and beverage vending machine facilities, small stands (for the sale of incidental food and beverage items, candy, chewing gum, newspapers and magazines), off-street parking including storage and valet parking, all such uses being solely for employees occupying any building constructed on Square 465 and their visitors.

5. Defendants' later interpretation of the "accessory use" restriction contained in Section H 4 e of the Plan is at variance with the language of the Plan, is contrary to the intention of the drafters, and is invalid and contrary to law. The vast range of retail commercial uses which RLA now claims are permitted for Square 465 would make nearly all the land use controls in the Plan meaningless and would undermine the integrity of the Plan itself. The draftsmen did not intend that the retail commercial land uses on Square 465 should be the same or comparable to those for L'Enfant Plaza, Town Center and Squares 463 and S–463.

■ 6. Plaintiffs purchased, leased, and/or developed their respective properties in reliance upon the language of the Plan and upon defendants' initial interpretation which narrowly construed Section H 4 e of the Plan.

7. Plaintiffs will suffer irreparable injury unless relief is granted and they are entitled to the injunctive and declaratory relief requested.