**DAVID NASSIF ASSOCIATES**

v.

**The UNITED STATES.**

No. 242–73.

United States Court of Claims.

June 15, 1977.

Marion Edwyn Harrison, Washington, D. C., attorney of record, for plaintiff. Harrison, Lucey & Sagle, Washington, D. C., of counsel.

Gary J. Fisher, Washington, D. C., with whom was Asst. Atty. Gen. Peter R. Taft, Washington, D. C., for defendant. Herbert Pittle, Washington, D. C., of counsel.

Before DURFEE, Senior Judge, and DAVIS and KASHIWA, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on exceptions of the parties to the recommended decision of Trial Judge John P. Wiese, filed October 14, 1976, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case.* It is, therefore, concluded as a matter of law (i) that plaintiff is contractually obligated to provide a cafeteria in the Nassif Building, (ii) that under the factual circumstances of this case a cafeteria of a reasonable size was called for, and (iii) that the cafeteria which the Government required plaintiff to install was in excess of reasonable size requirements.

The matter is remanded to the trial judge for the conduct of further proceedings to decide on the basis of the parties' evidence, the size of the cafeteria that plaintiff should have been obliged to install, and, also, to determine the amount of damages due plaintiff in light of such a redefined obligation. The issue raised by the Government's counterclaim is to be dealt with as part of the subsequent proceedings.

## OPINION OF TRIAL JUDGE

WIESE, Trial Judge: On April 11, 1968, the United States, acting through the General Services Administration (GSA), agreed to lease for a period of 20 years, approximately one-half of the floor space in an office building (the Nassif Building) which plaintiff, the owner and lessor, then had under construction. This lease, and the events surrounding its execution, give rise to the two basic issues presented in the present suit.

The matters in controversy are, first, did the lease agreement carry with it a contractual obligation, on plaintiff's part, to furnish a cafeteria in the Nassif Building; second, was the Government within its rights in insisting upon the installation of an 800-seat cafeteria in the Nassif Building. We decide the first question in the Government's favor and the second question in plaintiff's favor. The opinion addresses only the liability aspects of the case. The matter of the damages, if any, to which plaintiff may be entitled has been reserved for consideration in future proceedings.

### I. FACTS **

Plaintiff, David Nassif Associates, is a partnership engaged in the business of property development and ownership. It is the sole owner of a building called the Nassif Building, located at 407 6th Street, S.W., Washington, D.C., which today houses the secretariat and other principal offices of the Department of Transportation.

---

* The dissenting opinion of Senior Judge Durfee follows the opinion of the trial judge which has been adopted by the court.

** The facts recited in this opinion restate the separate Findings of Fact only to the extent necessary to an understanding of the result.

On a number of occasions prior to March 1968, and while the building was still under construction, plaintiff contacted GSA with a view to promoting that agency's interest in leasing space in the Nassif Building. On one such occasion, the contracting officer was shown a brochure of the building which, among other things, disclosed a cafeteria as one of the building's prospective features. At the time of these initial contacts between the parties, GSA did not have any particular space requirements to fulfill. However, by March 5, 1968, such requirements did materialize and, on that date, the Government issued a solicitation inviting offers for the rental of office space. Included in this solicitation were a series of so-called "award factors" which the contracting officer was required to consider along with the rent being proposed and the conformity of the offered space to the specific requirements listed in the solicitation. Among these award factors was the following:

c. Eating facilities must be available, either in the building in which the space offered is located, or within reasonable walking distance there from as determined by the Government (normally the Government lunch period does not exceed 30 minutes).

Plaintiff responded to the invitation. In a meeting with the contracting officer on March 7, 1968, it offered to lease space in the Nassif Building to the Government at $4.96 per square foot for office space and $2.75 per square foot for storage space, both spaces to be fully serviced, meaning, the lessor provides janitorial services, building maintenance and utilities. From the Government's point of view, these proposed prices were too high. The contracting officer maintained that GSA would not pay more than $4.65 per square foot for office space; hence, the offer was rejected.

Immediately following this unsuccessful meeting with the contracting officer, plaintiff moved to obtain reconsideration of its offer. On the same date, March 7, 1968, a letter from plaintiff's president was hand-delivered to the GSA Administrator. This letter, after first pointing out that plaintiff's per square foot price was well in line with current market prices, then went on to delineate with specificity the "extra features, not found in other buildings, [which] are provided in our space at no increased cost to the Government." The letter enumerated the building's particular "Construction Features" as well as its "Amenity Features" and, among these last, it listed "[c]omplete food service including restaurant, cafeteria, and drug store, and if desired, a staff dining room will be operated by the commercial tenant." The letter concluded by saying: "In light of these extra features and the recent prices paid by GSA, we respectfully ask that you review our offer with a view towards acceptance which I believe will assure the greatest possible savings to GSA in its lease acquisition program."

The Administrator's response to plaintiff's request for reconsideration was to set up a meeting between plaintiff and the Deputy Assistant Commissioner for Space Management, Public Building Service. In turn, the latter, being favorably impressed with the desirability of the space that was outlined in plaintiff's letter of March 7, 1968, began the process of serious discussions with plaintiff. These discussions, in which the contracting officer later joined, dealt with such matters as price, escalation clauses, frequency of escalation, lease duration, space partition requirements and building access on a 24-hour basis. The parties did not discuss the cafeteria requirement. However, based upon the content of plaintiff's March 7th letter, both the administrator who had opened the negotiations with plaintiff (the Deputy Assistant Commissioner) and the administrator who carried those negotiations to a final conclusion (the contracting officer), each held the understanding that the office space for which they had been negotiating would be serviced by a cafeteria to be located in the same building.

On March 8, 1968, as a result of its negotiations with the GSA officials, plaintiff submitted a written offer to lease. The

proposal offered space in the Nassif Building to the United States at $4.67 per square foot and storage space at $2.30 per square foot—a composite square foot rate of $4.559 excluding metered utilities (electricity and water). The offer stated that it was being submitted in accordance with the solicitation of March 5, 1968, "excepting its provisions for performance bond and the specific items hereinafter mentioned." The mentioned exceptions specified that plaintiff would provide carpeting (together with appropriate maintenance schedules), satisfy partitioning requirements as determined by initial office layouts and allow the Government 24-hour building access without additional cost. These listed exceptions reflected those several items (in addition to pricing matters) to which the parties had given particular attention during their negotiations. And, as was also true of the negotiations, plaintiff's offer did not address the matter of a cafeteria in the Nassif Building. Neither, however, did that offer propose to withdraw any of the building features that had been recited in plaintiff's March 7th letter.

On March 13, 1968, the Government wrote David Nassif Associates to confirm "the agreement reached, in principle, during our negotiations on March 8, 1968 * * *." This letter went on to enumerate the various details that had been discussed as well as those that remained to be negotiated and concluded by saying that a formal lease would be executed when all details had been worked out. This letter did not mention a cafeteria facility, or, for that matter, any of the building's amenity features.

Further discussions were held between the parties pertaining to such additional requirements as access provisions for the physically handicapped, the installation of a sprinkler system in certain building areas, and increases in the number of toilets and drinking fountains in the building. Plaintiff confirmed its willingness to accept these amendments to the solicitation by its letter of April 11, 1968, to the contracting officer. Then, on that same date, GSA wrote to advise plaintiff that "[t]he Government hereby accepts your offer, dated March 8, 1968, as amended April 11, 1968 * * * and will lease the entire second through tenth floors and 50,000 square feet of storage space * * *."

The execution of the lease followed—this also on April 11, 1968. Among other things, the lease recited that "General Specifications, dated March 5, 1968, the Lessor's offer dated March 8, 1968, and the Government's acceptance letter dated April 11, 1968, are incorporated into and made a part hereof by reference."

Early in 1969, plaintiff began a search for a food service operator who would be interested in locating a cafeteria in the Nassif Building. While it is unnecessary here to recount all that this search entailed, it should be noted that plaintiff's efforts were, for a long time, unrewarding. The problem that plaintiff frequently encountered was that prospective operators judged the expected demand—in what was to be essentially a one-meal-a-day cafeteria—insufficient to generate the income necessary to meet equipment amortization costs and rental expense. The Government, well aware of the situation, sought to alleviate the problem by relinquishing to plaintiff its control over the building's vending machine alcoves and also by restricting the type of food items that could be sold in the several concession stands that were planned for the building. It was hoped that this measure would contribute to an increase in expected revenue. As it turned out, however, this combining of income producing sources—vending alcoves and cafeteria—did not do much to heighten the attractiveness of a cafeteria facility in the Nassif Building.

The matter finally came to a head sometime late in November 1969, when plaintiff advised that it was suspending negotiations for the providing of food service in the Nassif Building. At that time, the Government, then already aware of and much concerned by plaintiff's lack of progress, took immediate action in response to plaintiff's announced intention to abandon the installation of food service in the Nassif Building.

On December 3, 1969, it wrote plaintiff, saying:

In a letter to the Administrator of General Services, dated March 7, 1968, Mr. Nassif offered as part of his general inducement for the lease of the Nassif Building that it would offer "Complete food service including restaurant, cafeteria, and drugstore, and if desired, a staff dining room will be operated by the commercial tenant." Throughout the subsequent days of negotiations which culminated in Lease No. GS–03–B–5564, this offer to provide food service, including a restaurant and cafeteria, was never withdrawn or modified by any spokesman for David Nassif Associates. It is subsequently our view that you are required under the lease to provide a restaurant and cafeteria in the Nassif Building.

The letter concluded by informing plaintiff that the Government was suspending its plans for a large-scale move into the Nassif Building in January 1970 "unless and until you assure us that you have entered into arrangements to provide adequate food service in that building, in accordance with your undertaking to do so."

In a reply to GSA dated December 10, 1969, plaintiff observed that it had been attempting for many months to secure a food service operation but had not been able to do so. The letter further stated that, according to counsel's advice, David Nassif Associates did not have a contractual obligation to provide food service for the Nassif Building.

In support of this position, the letter referred first to that language in the solicitation (the award factor, quoted *supra*), which said that "[e]ating facilities must be available, either in the building in which the space offered is located, or within reasonable walking distance there from as determined by the Government (normally the Government lunch period does not exceed 30 minutes)." Second, the letter said that "[w]e have found, based on our own survey of eating facilities available within a reasonable walking distance, that the above-mentioned requirement is fulfilled by virtue

of our building's location." The letter went on to enumerate eleven different eating facilities which plaintiff considered to be within reasonable walking distance. These locations included other Government buildings (which offered both cafeterias and executive dining rooms), as well as commercial restaurants.

Based upon this itemization of alternative facilities, plaintiff stated:

Even though all of these facilities would be in large competition with a new restaurant cafeteria in our building, we have made extensive efforts to find a food service operator. However, it appears that with the principal competition from the GSI cafeterias, a commercial operation of an additional cafeteria is a noneconomic venture and could only be predicated on a subsidized operation. David Nassif Associates is not in a position to subsidize such an operation. We will continue our efforts to find an operator, however after discussions with a least 17 commercial operations the possibility of securing such appears to be minimal.

In addition to the above matters, plaintiff's letter of December 10, 1969, also addressed a prior agreement between the parties pursuant to which the Government had agreed to assume occupancy of the building on a floor-by-floor basis in return for plaintiff's interim funding (*i. e.*, until building completion) of approximately $1,700,000 worth of Government-requested extras involving such items as a communications center, a health and dental clinic and automatic data processing facilities. The letter pointed out that plaintiff had complied with the Government's extra requirements. Hence, the decision stated in the Government's letter of December 3, 1969—to postpone occupancy until some indefinite time in the future—led plaintiff to request "that you advise immediately when the Government intends to proceed with acceptance of space with particular reference to the three floors presently completed."

As a result of the impasse between the parties respecting the cafeteria requirement, plaintiff proposed, and the Govern-

ment accepted, a supplemental agreement that would allow for a temporary accommodation of the opposing interests. This agreement recited that the Government had accepted and was paying rent on three floors in the Nassif Building but that, as of January 11, 1970, the four additional floors which had been tendered for acceptance had been declined by the Government. The agreement stated this refusal to assume occupancy represented a weekly loss to plaintiff of $11,000 per floor. The agreement then went on to offer the following points:

(i) that "Nassif forthwith will negotiate a lease with a food service firm to place in the Building a cafeteria of not less than 800-seat capacity"; the cafeteria to be ready "no later than September 1, 1970. For every day on and after November 1, 1970, for which the cafeteria is not fully available, Nassif shall pay to the United States $100 per day as liquidated damages; [1]

(ii) that "GSA will accept forthwith any floors tendered for acceptance and acceptable and will commence paying rent on floors accepted";

(iii) that "Nassif and the United States reserve all of their rights and remedies, * * * legal or equitable * * * to test the contention of the parties whether Nassif is obligated to provide a cafeteria in the Building."

Following execution of the supplemental agreement, plaintiff resumed its efforts to locate a food service operator. Again, for a time, these efforts were unsuccessful. Finally, however, on April 30, 1970, plaintiff initiated discussions with Drug Fair, Inc., and in May 1970, finalized a lease arrangement with this corporation that included 13,000 square feet for use as a drugstore (a requirement which Drug Fair had insisted upon), thirteen vending alcoves and approximately 19,000 square feet to be used as a cafeteria to seat at least 800 people.

Drug Fair began its cafeteria operation in the Nassif Building in August 1971. To date, it has proven to be an unprofitable undertaking to Drug Fair as well as to plaintiff.[2] The cafeteria is rarely more than half-filled and efforts to improve customer patronage, for example, the introduction of beer service, have changed the situation little. As late as spring 1974, a random check of cash register receipts showed that the cafeteria was then realizing only 800–1,100 daily individual sales. Drug Fair's president testified that he did not anticipate or foresee any reasonable chance for improvement in the cafeteria's profitability and, along with this, he testified that Drug Fair did not intend to renew its lease at the end of its initial term.

As one could expect, the parties offer conflicting reasons in explanation of the cafeteria's lack of success. These reasons are examined in detail in a subsequent part of this opinion. Suffice it here to say only that plaintiff maintains that the additional seating capacity available in the neighboring Government-subsidized cafeterias eliminated the need for still another full-size cafeteria in the Nassif Building, particularly one that would have to operate under conditions of competitive disadvantage.[3] The Government, on the other hand, argues that the cafeteria was appropriately sized

---

1. Although the 800-seat capacity cafeteria would appear, from the context above, to represent a figure that plaintiff had originated, the admitted fact is that this figure represents the seating capacity which the Government had come to insist upon shortly prior to the time that the parties entered into their supplementary agreement.

2. The Drug Fair drugstore also opened for business in the Nassif Building and proved to be a profitable operation. However, plaintiff was eventually forced to remove the drugstore as a result of a court order in another case, *L'Enfant*

*Plaza North, Inc. v. District of Columbia Redevelopment Land Agency*, 345 F.Supp. 508 (D.D. C.1972), aff'd, 159 U.S.App.D.C. 54, 486 F.2d 1314 (1973).

3. Unlike the Nassif Building cafeteria, the Government cafeterias operating in the same general locality (all approximately within a 5-minute walking radius (one way) from the Nassif Building) are not required to pay either rent or utility costs, nor are they required to commit funds for the initial, and substantial, investment in necessary special equipment.

and that the low patronage reflects the cafeteria's higher-than-normal pricing and deficiencies connected with its physical layout.

## II. DISCUSSION

A. As to the first of the issues presented in this litigation—whether plaintiff contractually obligated itself to provide a cafeteria in the Nassif Building—there is little room for argument. At virtually every step in its dealings with the Government, plaintiff affirmatively manifested an intent to install a cafeteria. It exhibited this purpose at the time of its initial contacts with the Government (before the Government had issued its solicitation), it pursued the implementation of this purpose for months following execution of the lease agreement, and, most important of all, in extolling the merits of the Nassif Building in the offer that was submitted for GSA's reconsideration on March 7, 1968, it then clearly represented that the building would contain a cafeteria. Among other things, that offer stated: "[t]he following extra features, not found in other buildings [specifically naming 'restaurant, cafeteria, and drug store'], are provided in our space at no increased cost to the Government." The letter concluded by saying, "In light of these extra features and the recent prices paid by GSA, we respectfully ask that you review our offer with a view towards acceptance * * *." Clearly, this was language of promissory intent. Furthermore, it was plaintiff's March 7th offer and none other which formed the basis upon which the parties' negotiations were opened as well as substantially concluded.

Now, however, the argument is raised that we may not look to the March 7th offer to define any part of plaintiff's contractual undertaking because neither that offer nor its particular recitals are referred to in the lease agreement. Aside from the solicitation itself and the Government's acceptance letter, the lease refers only to the "Lessors offer dated March 8, 1968" and that offer, in turn, does not mention a cafeteria requirement. Thus, as plaintiff sees the situation, if there is a cafeteria obligation to be found outside the formal lease agreement then the parol evidence rule would now preclude our giving that obligation any force or effect.

As a separate matter, plaintiff also makes the contention that the terms of the March 7th offer were contingent upon the Government's acceptance of the space at the price therein quoted. Consequently, according to plaintiff's argument, the Government, having obtained, through negotiation, the benefit of a lower rental (as well as certain other amenities not originally specified in the March 7th offer such as 24-hour building accessibility) may now no longer claim that it remains entitled to a cafeteria as well. Neither of these arguments has merit.

■■■ To begin with, the parol evidence rule does not, per se, foreclose consideration of matters external to the parties' written agreement. The rule is a rule of substantive law, not a rule of evidence, and what it prohibits is the use of external evidence to add to or otherwise modify the terms of a written agreement in instances where the written agreement has been adopted by the parties as an expression of their final understanding. Restatement (Second) of Contracts § 239 (Tent. Drafts Nos. 1–7, 1973). That finality may encompass one or more terms of the written agreement or the written agreement may represent the complete and exclusive statement of the parties' intentions. In either case, however, and contrary to what plaintiff's argument seems to imply, it is not the writing alone which attests to its own finality and completeness but the circumstances surrounding its execution, including the negotiations which produced it. This observation, while true for all cases, is especially pertinent in instances where, as here, the writing itself contains no recitals or other evidence testifying to its intended completeness and finality. The surrounding circumstances are what plaintiff's argument ignores.

One can begin with the fact that the offer incorporated into the lease agreement, the "Lessor's offer dated March 8, 1968,"

intended no fundamental departure from the terms that were first, and then more fully, spelled out in the March 7th offer. Indeed, to put it more accurately, the March 8th offer was not a new offer at all; it was really nothing more than the formalization, in writing, of an agreement whose major points had already been agreed upon through negotiations that were undertaken and substantially concluded on the basis of the content of plaintiff's March 7th offer.

That this, in fact, was the situation is apparent from the Government's letter of March 13, 1968, which was written to confirm "the agreement reached, in principle, during our negotiations on March 8, 1968." (The negotiations of March 8, 1968, *preceded* the offer of that same date.) Thus, the fact that the lease agreement happens to reference plaintiff's March 8th offer rather than the March 7th offer is, in and of itself, of little consequence. The very circumstances which explain the existence of a March 8th offer in the first place negate the idea that the contents of that offer are to be taken as new matter to be read and understood without regard to preceding events. To put it another way, the fact that the March 8th offer fails to mention a cafeteria means nothing unless it is shown too that that omission mirrors the intent of the parties' preceding negotiations.

The record offers no evidence that would establish such a connection. Rather, what is shown is that, in the course of the negotiations involving plaintiff's March 7th offer, the Government directed its attention exclusively to those aspects of the offer which were, for it, matters of special concern, such as price, building access, and partitioning requirements. Thus, the parties never addressed the cafeteria requirement. However, in the face of an offer which clearly promised a cafeteria in the Nassif Building, the Government could rightfully assume, as its lease negotiators in fact did, that absent anything said to the

contrary by either party, the building would be completed in the manner that plaintiff's offer had specified, that is, that it would contain a cafeteria. Significantly, the promise of a cafeteria was never retracted by plaintiff during the negotiations.

In this connection, it may be noted too that the facts offer no support at all for the contention (Plaintiff's second argument) that the promise of a cafeteria in the Nassif Building was contingent upon the Government's acceptance of the building space at the rental figure initially quoted in the March 7th offer. There was nothing said, either in plaintiff's March 7th offer or during the course of the negotiations had with respect thereto, that would or should have suggested to the Government that the process of bargaining for and reaching agreement upon a lower rental figure than plaintiff had initially asked for [4] carried with it a corresponding contraction in the scope of the services or amenity features that the rented space could expect to receive upon occupancy. If such a "tie-in" is what plaintiff really had in mind (and the point is, at best, a conjectural one), then the answer is simply that plaintiff failed completely to communicate that purpose to the Government. Since contractual obligations are to be ascertained from objective manifestations of intent, plaintiff's mental reservations are legally irrelevant. What matters only is that plaintiff's offer promised a cafeteria and nothing said or done during the course of the negotiations diminished that manifested intent one iota.

Consequently, given the mode and manner in which the negotiations were conducted, the incorporation into the lease agreement of an offer which made no mention of a cafeteria requirement provides no occasion for concluding that such a requirement does not now exist. The documenting offer that was incorporated into the lease (the March 8th offer) dealt only with the specifics of the parties' negotiations and,

4. Plaintiff's initial offer of office space at $4.96 per square foot included the cost of metered utilities. The offer of March 8th, set the price of office space at $4.75 per square foot excluding metered utilities. After adjustment for utility cost differences, the March 8th offer reflects a price concession on plaintiff's part of $.08 per square foot for office space.

like those negotiations, this attention to specifics intended no limitation or disavowal of the remaining content of plaintiff's March 7th offer. In short, contrary to the premise upon which plaintiff argues, the lease agreement was not intended as the final and exclusive word insofar as the scope of plaintiff's contractual undertaking was concerned. Rather, it is the lease agreement, together with those provisions of the March 7th offer that the negotiations left intact, which define the entirety of plaintiff's obligations to the Government. A cafeteria was promised.

B. For the reasons given above, the absence of any discussion during the negotiations concerning the cafeteria requirement does not extinguish plaintiff's contractual obligation in that regard. The promise of a cafeteria was made and accepted. Nevertheless, the lack of such discussion does raise a problem concerning the size of the eating facility (*i. e.*, seating capacity) that plaintiff could have been expected to install.[5]

The problem was answered, but only in a temporary fashion, by virtue of the parties' supplemental agreement which incorporated the Government's demand for an 800-seat facility. Now, however, the issue is once more drawn into focus because the 800-seat cafeteria that was installed has proven to be an unprofitable venture, the cafeteria being rarely more than half-filled. From plaintiff's point of view, this lack of patronage underscores the fact that a cafeteria was not needed, or, at least, not one of the size that the Government did insist upon. The Government, on the other hand, maintains that the lack of patronage is not a reflection of a lack of demand, per se. Instead, it is claimed to be a reflection of the cafeteria's excessive prices and deficiencies in its physical layout that together result in a diversion of customers to the other eating facilities in the area.

Normally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court. However, in this case, by virtue of the severance of issues (which occurred during the course of trial), the question of the cafeteria's proper size was reserved for consideration as part of any later quantum proceedings. What was left for determination in this phase of the litigation was simply the threshold question whether the Government was within its rights in requiring plaintiff to install an 800-seat cafeteria facility in the Nassif B uilding.

The Government defends its imposition of this requirement on three grounds. It contends, first of all, that plaintiff's obligation to install an 800-seat cafeteria is an obligation founded in a later and separate contractual undertaking between the parties, and, accordingly, is now an issue that is no longer open to question. Second, it contends that, in any event, the Government had the right, under the lease agreement, to unilaterally determine the size of the cafeteria, and, third, it claims that the cafeteria size it did require did not exceed what reasonable business standards would have justified in the same circumstances.

In support of the first of these arguments, the Government points to the parties' supplemental agreement, and, in particular, to that language which recited that the Government would assume occupancy of the building on a floor-by-floor basis, *i. e.*, as each floor was completed. This obligation, says the Government, represented the *quid pro quo* for plaintiff's agreement to install a cafeteria having 800 seats. The Government identifies this purported exchange as one involving "obligations the parties did not have [prior to the execution of the supplemental agreement]."

---

5. As said, during their negotiations, the parties never discussed the matter of the cafeteria's *size*. Even more than that, it was quite literally an issue to which neither party ever gave any thought. This lack of attention to a detail one would ordinarily suppose to have been of major importance to all was explained, by the contracting officer, as having come about simply because instances of similar lease negotiations in the past had never resulted in the type of problem that eventuated in this case. Hence, the Government had no reason to foresee any problems in continuing its lease negotiations in the fashion that was followed here.

■ The Government's argument is correct in only one regard: prior to the execution of the supplemental agreement plaintiff did not have an obligation to install a cafeteria of any definite seating capacity. The rest of the argument, however, is pure invention.

For one thing, the text of the supplemental agreement itself reveals that the Government was under a preexisting obligation to accept floors on an "as ready" basis in consequence of an earlier promise given in return for plaintiff's installation (and also temporary funding) of approximately $1,700,000 worth of Government-requested special facilities in the Nassif Building. Thus, the contention that plaintiff bargained for the Government's promise to proceed with occupancy on a floor-by-floor basis in return for accepting an obligation to install an 800-seat cafeteria is entirely out of joint with the facts. Beyond that—and this is the more important point—it was never the purpose of the supplemental agreement to *resolve* the cafeteria requirement question. Rather, the only aim of that agreement was to allow performance to proceed without sacrifice to either party's right to litigate that issue at a later date. In short, plaintiff's "agreement" to install an 800-seat cafeteria was never intended to concede either that it owed a cafeteria, or, even, if one was owed, that it then should be of the seating capacity then specified by the Government.[6]

As to the second argument, namely, that the lease agreement granted the Government the right to unilaterally determine the size of the cafeteria that could be required, this too is without merit. The argument is grounded upon the language of the solicitation's award factor which reads as follows:

c. Eating facilities must be available, either in the building in which the space

offered is located, or within reasonable walking distance there from as determined by the Government (normally the Government lunch period does not exceed 30 minutes).

■ It is apparent that the above-quoted language does not vest the Government with the right to unilaterally determine the size of the eating facility. But an observation even more to the point is that language has nothing at all to do with defining the rights and obligations that make up the terms of the parties' lease agreement. An award factor, by definition, is intended to serve only as a guide in the Government's initial evaluation of offers; it adds nothing of content to an offer once accepted. If, in this case, plaintiff's offer had not promised a cafeteria, the Government could not later have drawn upon the award factor language to remedy that deficiency. For the same reason, it cannot now invoke that language as authority to supply the missing size requirement.

We come then to the last of the Government's arguments—the contention that the cafeteria that was installed in the Nassif Building was of a size consistent with reasonable business dictates. As a preliminary matter, it is to be noted that, on occasion, a building owner may plan the installation of a cafeteria in a building, not for profit purposes, but simply to secure the Government as a long-term tenant. Such, however, was not the situation in this case.

From the beginning, plaintiff looked upon the existence of a cafeteria facility in the Nassif Building as a means of realizing a dollar return on lower level floor space greater than that which it could have obtained through the rental of the same space for storage purposes. This was the thought it had in mind when it first represented that the Nassif Building would con-

---

**6.** The supplemental agreement addresses only the question of whether, or not, plaintiff was contractually obligated to install a cafeteria in the Nassif Building. It does not address the question of cafeteria size. However, given plaintiff's position that a cafeteria (even if contractually owed) would be an uneconomic venture, it is a fair inference to say that what the parties had in mind was a cafeteria of a size reasonable under all the circumstances. In this connection it should be noted that at no time prior to the briefing stage of this lawsuit did the Government ever contend, as it now does, that the matter of the cafeteria's size was subject to its own unilateral right to determine.

tain a cafeteria—it was intended to be a profit-oriented operation.

That the Government too expected the cafeteria to be a self-supporting undertaking rather than an owner-subsidized enterprise is evidenced in several respects. There is, first of all, the award factor language which identified the requirement for eating facilities in the offered space as a conditional requirement, one depending upon the availability of other eating establishments in the area. If the Government had intended to have a cafeteria in the offered space that was to operate without regard to its profitability to the lessor, then the award factor language was a poor choice of words. For, under those circumstances, the language need only have said that a cafeteria in the offered space was essential. But, given the language that was used—"[e]ating facilities must be available either in the building * * * or within reasonable walking distance * * * "—this necessarily implied a recognition, on the Government's part, that market conditions would be a factor in gauging the economic feasibility of adding an additional eating facility to those already in existence.

This same sense of the situation was exhibited also by the contracting officer who testified that, from the Government's point of view, what was expected from the lessor (meaning, plaintiff) was a cafeteria facility of a size which "as a matter of business judgment, would be [sufficient] to meet the demand." Again, this reference to "business" judgment parallels the thought that underscores the award factor language— the cafeteria was to be geared to the economic realities of the situation, meaning, a service for profit rather than a service which addressed only the Government's convenience without regard to the costs it might entail to the lessor.

Finally, it is to be noted that the Government never questioned the economics upon which plaintiff directed its search for a food service operator. The cafeteria facility, as the Government knew, was expected to yield a return to its operator above and beyond the revenues necessary to cover equipment amortization expenses, utilities and rental income to plaintiff. Indeed, the Government did more than not question plaintiff's approach to fulfilling the cafeteria requirement. To its credit, it actively sought to assist plaintiff by relinquishing its control over the building's several vending machine alcoves along with the revenue that was expected therefrom. Clearly then, a profit-directed cafeteria operation is what the parties had in mind. It is against this background that we now address the Government's argument that the 800-seat cafeteria represented a reasonably sized facility for the Nassif Building.

The Government tells us that, according to industry standards and also its own studies, an in-house cafeteria located in a downtown office building can expect a customer draw of approximately 50 to 60 percent of the building's employee population. Additionally, industry guidelines anticipate a turnover of three customers per chair during the course of a normal 2-hour lunch period; consequently, based upon this turnover rate, a cafeteria's seating capacity (*i.e.,* number of chairs) should be roughly equal to one-third of its expected total draw.

When applied to the Nassif Building, these guidelines suggest a cafeteria of approximately 1,300 seats.[7] By contrast, however, the cafeteria that was installed in the Nassif Building had a much smaller seating capacity (800 seats) and it is this difference in capacities, and the favorable comparison that it implies, that the Government relies upon to support the reasonableness of the cafeteria size that it required.

On the face of it, the Government offers an appealing argument. It demanded from plaintiff much less than what trade stan-

---

7. At the time the supplemental agreement was executed (January 1970), it was anticipated that the Nassif Building would house 6,500 employees. Consequently, assuming a 60 percent patronage factor, the cafeteria could ex-pect a total draw of 3,900 employees, and, therefore, based upon the turnover factor, would require one-third that number of seats, or, in this case, 1,300 chairs.

dards would have suggested as appropriate. The difficulty with this argument, however, begins with the fact that the industry guidelines upon which the Government bases its position are, in themselves, of questionable accuracy. Plaintiff's proof brings out that, of five neighboring Government cafeterias, only one enjoys a patronage level within the indicated area of 50 to 60 percent of the building's population. The remainder fall considerably below this guideline projection, ranging from a low of 28.7 percent (in the case of a then-partially completed building) to a high of 44.7 percent, with two buildings exhibiting a 35 percent patronage factor.

Standing alone, however, these lower-than-guideline patronage figures do not entirely discredit the Government's position for the cafeteria installed in the Nassif Building would have the capacity to serve 2,400 employees or, approximately 37 percent of that building's total population. Thus, this capacity, though far less than that suggested by industry standards, still falls within the range of the patronage levels being experienced in the neighborhood Government cafeterias.

However, concerning these neighborhood Government cafeterias, there are these points to note: all were located approximately within a 5-minute walking radius, each way, of the Nassif Building, all were subsidized operations admittedly able to sell food at lower prices than a profit-oriented operation such as the Nassif Building cafeteria, and, four of these five cafeteria facilities had additional capacity which, without any extension of operating hours, could collectively accommodate an added luncheon patronage of 2,511 people during the course of a normal 2-hour lunch period.[8]

Considering the above factors in light of the Government's acknowledgment that cafeteria patronage is influenced by food prices, it is reasonable to assume that a profit-directed cafeteria, sized to accommodate 2,400 people (37 percent of the Nassif

Building's population), could not expect to attain that projected level of patronage in the face of competing operations that offered accessible, additional capacity and lower prices. Particularly would this seem a fair statement to make in view of the fact that at least two of these same competing cafeteria facilities were themselves operating at a patronage level less than 37 percent of their respective employee populations.

The observations in this regard are reinforced by the testimony of Drug Fair's president (operator of the Nassif Building cafeteria) who, when confronted for the first time with the statistics bearing upon the additional seating capacity in the area, stated: "seeing this [the witness was referring to a table reflecting the capacity and patronage levels of neighborhood Government cafeterias] I would say that we would have to depend [for business] on the Nassif Building almost in its entirety. And based on that, I would say that the cafeteria just could not make it based on the knowledge that the average food operator would have of what happens to Government buildings."

The Government argues that it would not be correct, in evaluating the cafeteria needs of the Nassif Building, to give consideration to the additional seating capacity that exists in the neighboring Government facilities. These facilities, involving as they do a 5-minute walk each way, are said to be out of reach, timewise, given the limitations of a one-half lunch period specified by general governmental policy.

In the abstract, the argument has merit. The problem with the argument, however, rests in the fact that no proof was introduced to establish that this so-called "official" Government lunch period was actually adhered to on the part of the agency or the employees occupying the Nassif Building. The point is a fair one to question since even the solicitation's award factor did not lay down an absolute requirement in this regard; instead, it stated that *"normally*

---

**8.** This additional capacity does not take into consideration the added seating available in the several executive dining rooms that were also located in these same Government buildings. If this too were included, the additional capacity would increase to 3,255 seats.

the Government lunch period does not exceed 30 minutes" (emphasis supplied). Furthermore, if adherence to this general policy was, in fact, required as well as enforced in the Nassif Building (and thereby precluded access to alternative eating facilities), then the Government would have no factual ground for now saying that undersized serving facilities with resultant overcrowding in the Nassif Building cafeteria (two points discussed below) prompted customers to seek service elsewhere, including the other Government cafeterias in the area.

As it stands at this point, the evidence discloses enough (though perhaps just barely so) to permit the conclusion that in insisting upon an 800-seat cafeteria, the Government demanded more than the market would warrant or could support. The figures discussed above support this conclusion; so too does Drug Fair's actual experience in operating the cafeteria—an experience which lends confirmation to what plaintiff had first reported to the Government after a long search for a food service operator—namely, that the commercial operation of an additional full-size cafeteria in the Nassif Building would be a noneconomic venture.[9]

■ There are other points raised by the Government but these do not detract from the conclusion that has been reached. For one thing, it is claimed that the cafeteria's patronage was adversely affected by undersized serving areas that resulted in crowding of customers at these points and at the cash registers—conditions which, in turn, caused customers to go elsewhere for service. The answer plaintiff gives to this charge is that the cafeteria incorporated the very latest in physical design, the so-called "hollow square" concept and that use of the conventional cafeteria line would have made customer progress through the cafeteria an even slower affair. The Government's proof does not deny the validity of these answers.

Neither does the Government's proof deny the fact that overcrowding in the Nassif Building, as in other Government buildings, can, and very often does, result from the fact that the tenant agencies release the majority of their personnel at the noon hour. There is nothing in the record to suggest that the overcrowding that was observed in the Nassif Building cafeteria was not, in the last analysis, due substantially, if not entirely, to the fact that lunch hours were permitted on a non-staggered basis.

A contention is also made that patronage was adversely affected by food prices that were higher than the expected 15 to 20 percent differential that generally marks the spread between a Government subsidized cafeteria and a private, profit-oriented operation. But, as to this point, the Government's proof falls far short of showing that the prices were excessive given the costs that they were expected to cover—utilities, rent, equipment amortization expenses and labor charges.

Moreover, the Government, in this case, is hardly in a position to voice after-the-fact complaints concerning the cafeteria's pricing. The time to have raised that matter was when it decided to require an 800-seat cafeteria for it knew then, as it had for months before, that plaintiff was seeking to derive a profit from the cafeteria operation and consequently was seeking rental income from the cafeteria floor space. At that time, a timely inquiry on the Government's part concerning the economic constraints in which plaintiff found itself might have shed much light on the question of how large a cafeteria could be secured without overstepping those constraints. That too would have been the time to take stock of the fact that the Government had negotiated a contract that was to include a cafeteria whose size was definable with no greater precision than the contracting officer's "business judgment" rule.

Business judgment, in this case, dictated a cafeteria of a lesser size than the 800-seat

---

**9.** This is not to imply, however, that there was no need at all for a cafeteria. The fact that the Nassif Building cafeteria does enjoy considerably more than token patronage is enough to confirm that a facility of some lesser size than now exists is warranted.

facility which the Government came to insist upon.

## III. SUMMARY

That plaintiff did obligate itself to provide a cafeteria in the Nassif Building is established by its words and by its actions. That the Government demanded more in terms of cafeteria size than the circumstances could economically justify has also been proven. In the subsequent proceedings, the parties will have to address, among other things, the question as to what size cafeteria was economically justifiable given that what was intended was a profit-oriented cafeteria facility geared essentially to a one-meal-a-day operation. While the parties are, of course, free to develop their future proof as they wish, the task before them would appear to be essentially one of establishing by reference to facts that were, or could have been, known to them at the time of their negotiations, what cafeteria size they would *then* have agreed upon. And, since fairness is now the only real guideline for such an after-the-fact judgment, this matter of size definition will necessarily require the parties to recognize that a balance will have to be struck between plaintiff's profit expectations and the Government's concern to provide food service in the Nassif Building to as large a segment of the employee population as could realistically be expected to require such a service.

DURFEE, Senior Judge, dissenting in part:

I respectfully dissent from that part of the trial judge's opinion, adopted as the opinion of the court, which holds that plaintiff was contractually bound to furnish a cafeteria for the Nassif Building. Such a holding, under the facts of this case, is violative of the parol evidence rule.

The parol evidence rule requires "the exclusion of extrinsic evidence, oral or written, where the parties have reduced their agreement to an integrated writing." 4 Williston, Contracts § 631 (3d ed. 1961). In determining the applicability of the parol evidence rule, the crucial step is to ascertain whether the parties assented to the writing in question as a complete integration of their agreement. 3 Corbin, Contracts § 582 (1960). Thus, the issue in this case centers on whether the lease agreement, executed on April 11, 1968, constituted a complete integration of the parties' agreement.

Restatement (Second) of Contracts § 235(3) (Tent. Drafts Nos. 1–7, 1973) provides:

> Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression.

Admittedly, in determining whether or not the writing in issue constitutes a complete integration, a court should not restrict itself to a mere interpretation of the words of that writing. The writing itself is not conclusive in this respect, but it is an influential factor to be considered. Extrinsic evidence that may subsequently be barred for purposes of varying or contradicting a writing by the parol evidence rule, may be admissible for purposes of determining whether or not that writing was intended as a complete integration by the parties. 3 Corbin, Contracts §§ 581–82 (1960). However, utilizing the extrinsic evidence at issue for the limited purpose of determining the degree of integration, I can only conclude that the April 11th lease agreement constituted à complete integration of the parties' agreement.

The lease agreement of April 11, in addition to setting forth the amount of space leased at a specified price and incorporating a Services, Utilities and Maintenance Schedule, includes the following language:

> General Specifications, dated March 5, 1968, the Lessor's offer dated March 8, 1968, and the Government's acceptance letter dated April 11, 1968 are incorporated into and made a part hereof by reference.

Such language creates a strong presumption that the parties intended the April 11th writing to be a complete integration of their agreement, a presumption unrebutted by the facts of their prior negotiations.

The trial judge reached his determination that "the lease agreement [did] carry with it a contractual obligation, on plaintiff's part, to furnish a cafeteria" principally on the basis of the prior March 7th letter from plaintiff to defendant, which was written in an attempt to have defendant reconsider plaintiff's original offer. In this letter, plaintiff listed ten "Construction Features" and eleven "Amenity Features" of its building. In addition to the "Amenity Feature" providing for "[c]omplete food service including restaurant, cafeteria, and drug store * * *" emphasized by the trial judge, these extra features included such generalities as: "[s]hopping plaza for employee convenience and benefit", "[e]xceptionally high quality landscaping * * *", "[q]uality carpeting throughout * * *", "[a]ll electric operation provides no air pollution * * *", etc. These extra features constitute general plans plaintiff had for the building, and cannot be construed as specific components of an offer to which plaintiff intended to be bound.

Subsequent negotiations between the parties further emphasize that plaintiff should not be contractually bound to furnish a cafeteria. Neither the negotiations following plaintiff's March 7th letter, plaintiff's March 8th offer, defendant's March 13th confirmation of the agreement reached in principle, plaintiff's April 11th letter agreeing to certain additional requirements, defendant's April 11th acceptance, nor the lease agreement itself dealt with a cafeteria requirement. Nor can it be said that the cafeteria issue was of such significance so as to be taken for granted in the negotiations.

By the same token, the negotiations subsequent to the March 7th letter did deal with specific matters of relatively minor import. The March 8th offer by plaintiff obligated plaintiff to perform certain carpeting and partitioning tasks. Following the agreement reached in principle as expressed in defendant's March 13th letter, further negotiations were conducted between the parties on such additional requirements as access and restroom provisions for the physically handicapped, and installation of a sprinkler system. This was evidenced by plaintiff's April 11th letter to defendant confirming its willingness to conform with these additional requirements. Defendant's April 11th letter of acceptance specified that a set minimum number of parking spaces for Government employees be set aside. These provisions, dealing with specific matters, were incorporated by reference into the lease agreement.

The negotiations and writings between the parties did not constitute a series of separate agreements, but were viewed as preliminaries to the execution of the April 11th lease agreement, which encompassed all agreements between the parties. In light of the factors incorporated by reference into the lease agreement, that writing cannot be construed as only dealing with one aspect of the parties' agreement (e.g., the actual rental of floor space).

Thus, the parties incorporated into the lease agreement the relevant aspects of the negotiation process, but not a cafeteria requirement. The items incorporated into the lease agreement in turn dealt with specifics (e.g., the parking spaces specified in defendant's April 11th acceptance letter; the reference in that letter to the acceptance of other additional requirements by plaintiff in its April 11th letter to defendant; and the carpeting and partitioning requirements set out in plaintiff's March 8th offer).

The lease agreement of April 11, in itself, constitutes a complete integration of the agreement of the parties. The fact that certain extra features discussed in plaintiff's March 7th letter were not incorporated into the finalized agreement reached on April 11 does not render that agreement a mere partial integration. Where both the written agreement and extrinsic evidence establish that the writing constitutes a complete integration of the parties' agreement, the parol evidence rule bars the utilization

of such extrinsic evidence to vary or contradict the terms of the written agreement. Consequently, since no cafeteria requirement is found in the April 11th lease agreement, including the documents it incorporates by reference, plaintiff is not contractually obligated to provide a cafeteria.

Assuming *arguendo* that the trial judge's interpretation of the parol evidence rule, as applied to the facts of this case, is correct, it must still be established that there was an actual agreement between the parties that plaintiff was to provide a cafeteria before plaintiff can be said to be contractually bound to such a provision. There is no doubt that, at the time of the negotiations, plaintiff anticipated that a cafeteria would be furnished for the building. However, in this same regard, plaintiff never assented to contractually binding itself to provide such a cafeteria.

For the dealings between the parties (in particular, the March 7th letter) to be regarded as imposing a contractual obligation on plaintiff, it must be established, as a minimum, that the parties intended plaintiff to be contractually bound to furnish a cafeteria. The trial judge's ultimate decision cannot be reconciled with his Finding of Fact No. 21 (adopted by the court majority) that:

> [A]t the time it leased space to the Government, plaintiff did then intend to provide a cafeteria in the building. *By the same token, plaintiff did not consider that it was contractually obligating itself to provide a cafeteria since it did not regard its March 7th letter to be part of the lease agreement.* [Emphasis added].

If, as was found, plaintiff did not consider that it was contractually binding itself to provide a cafeteria, it is self-contradictory to assume that the parties reached an "agreement" on the cafeteria issue in the form of a binding contract. At least in the absence of a specific writing to the contrary, any manifestation of mutual assent is lacking.

For the foregoing reasons, I would hold that plaintiff was not contractually bound to furnish a cafeteria for the Nassif Building.