**DAVID NASSIF ASSOCIATES**

v.

**The UNITED STATES.**

No. 242–73.

United States Court of Claims.

Feb. 11, 1981.

Marion Edwyn Harrison, Washington, D. C., attorney of record, for plaintiff; Barnett, Alagia & Carey, Washington, D. C., of counsel.

James T. Draude, Washington, D. C., with whom was Asst. Atty. Gen., James W. Moorman, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and DAVIS and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case is before the court on plaintiff's exceptions to the decision and findings of Trial Judge John P. Wiese. Oral argument has been had and we have also considered the briefs. We agree with the trial judge's decision and findings, except for part of his holding on liquidated damages; on that issue we agree with his discussion rejecting the contention that no liquidated damages should be allowed at all, but we believe

that, instead of being totally granted to defendant, the liquidated damages should be divided proportionately. Accordingly, we have adopted the bulk of the trial judge's opinion, but have added our own discussion and holding at the end of the portion of his opinion on liquidated damages. We have also modified the "Summary" of the opinion and the "Conclusion of Law" to accord with our views.*

Trial Judge Wiese's opinion, as modified by the court, is as follows:

In the first round of litigation in this case, reported at 214 Ct.Cl. 407, 557 F.2d 249 (1977) (hereinafter referred to as Nassif I), it was decided that plaintiff, David Nassif Associates, the owner and lessor of the building now housing the Department of Transportation (the Nassif Building), had contractually committed itself to provide and to maintain a cafeteria operation in that building for the 20-year period of the Government's tenancy. In the process of reaching this conclusion, the court observed that, while the parties' objective manifestations of assent gave clear evidence that a cafeteria was included in the terms of plaintiff's offer to lease, and that this offer was so understood and accepted by the Government, nevertheless, by mutual oversight, the matter of the cafeteria size was never focused upon, either in the negotiations or in the subsequent lease agreement itself. Such being the state of affairs, the court observed: "Normally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court. However, in this case, by virtue of the severance of issues (which occurred during the course of trial), the question of the cafeteria's proper size was reserved for consideration as part of any later quantum proceedings." *David Nassif Associates v. United States, supra,* 214 Ct.Cl. at 423, 557 F.2d at 258. This then, is the subject of the present suit: the determination of cafeteria size together with certain other related quantum issues.

---

* We have adopted the trial judge's findings but they are not printed herewith.

Stated broadly, the chief conclusions reached are as follows: First, that plaintiff is contractually obligated to provide for and to maintain in the Nassif Building, for the period of the Government's tenancy, a 320-seat, 9,000 square foot full-service cafeteria. Second, that, by virtue of rights and obligations assumed by the parties under the terms of a supplemental agreement, the Government is liable to the plaintiff for excess construction costs and for the fair rental value of floor space; plaintiff, in turn, is liable to the Government for some liquidated damages and for excess condemnation costs. The specific amounts owing are set forth in the opinion.

## I. FACTS **

A factual background sufficient to an understanding of the case in its present posture can begin with that point in the parties' dealings, late November 1969, when Nassif Associates (plaintiff herein), acting on the advice of counsel, informed the Government that, under the terms of the parties' lease agreement of April 11, 1968, it did not have a contractual obligation to provide food service for the Nassif Building. The Government, being of a much different view in the matter, advised plaintiff in return that, absent arrangements guaranteeing the availability of food service in the building, the Government would postpone indefinitely its plans for a large-scale move into the Nassif Building in January 1970.

By way of accommodating their conflicting positions—at least for a time—the parties entered into a supplemental agreement the relevant sections of which read as follows:

(1) Nassif forthwith will negotiate a lease with a food service firm to place in the Building a cafeteria of not less than 800-seat capacity.

(2) Nassif agrees that the cafeteria will be available as soon as possible and in any event no later than September 1, 1970. For every day on and after November 1, 1970, for which the cafeteria is not fully available, Nassif shall pay to the United States $100 per day as liquidated damages. Any delay in meeting this November 1, 1970 date which would be excusable pursuant to the terms of paragraph 9 of Schedule D, Miscellaneous Provisions, of said lease between Nassif and the United States for the Building will be an excusable delay.

For a number of reasons, some of which are discussed in the subsequent section of this opinion, a cafeteria did not become operational in the Nassif Building until August 9, 1971, almost a year beyond the commencement date contemplated in the parties' supplemental agreement. The operation proved unsuccessful from the start. Thus, towards the end of the cafeteria's initial lease term, Drug Fair, Inc., the food service operator, advised Nassif Associates that its option to renew the lease for the cafeteria space would go unexercised and that the cafeteria operation would, therefore, terminate as of August 31, 1976. Plaintiff advised the Government of this turn in events and some time later, approximately April 1976, it also advised the Government that there would be no continuation of a cafeteria operation in the Nassif Building following the cessation of Drug Fair's operations.

Prompted by its need to insure the continuation of a cafeteria service in the Nassif Building and faced with plaintiff's intransigence on the point, the Government took the matter into its own hands. On August 30, 1976, the United States brought a condemnation action in the district court to condemn a leasehold on the entire cafeteria space in the Nassif Building and on August 31, 1976, it entered into a contract with Drug Fair, Inc. to continue the cafeteria operation through August 31, 1980—the current expiration date of the condemna-

---

** The facts noted here are taken, in part, from the findings established in *Nassif I* and from the accompanying "Findings of Fact" that were established by the proof offered in the present proceeding. To the extent the opinion relies upon factual matter not directly noted in or derivable from these two sources, the same are intended to constitute additional findings of fact.

tion leasehold. Trial of the instant matter went forward in this court in late 1978.

Out of the facts recited briefly above, as well as those noted in *Nassif I*, there emerge a series of crossing demands for damages, the details and resolution of which make up the subject matter of the discussion that follows next.

## II. DISCUSSION

A. *Cafeteria Size: Seating Requirements.* As noted at the outset, chief among the issues now to be resolved is the question of determining the size of the cafeteria for the Nassif Building that the parties would have agreed upon at the time of their initial lease negotiations given, as the court had observed in *Nassif I,* "that what was intended was a profit-oriented cafeteria facility geared essentially to a one-meal-a-day operation." *David Nassif Associates v. United States, supra,* 214 Ct.Cl. at 431, 557 F.2d at 263. Again, on the same subject, and speaking now to the hoped-for proof to come, the earlier opinion stated: "[S]ince fairness is now the only real guideline for such an after-the-fact judgment, this matter of size definition will necessarily require the parties to recognize that a balance will have to be struck between plaintiff's profit expectations and the Government's concern to provide food service in the Nassif Building to as large a segment of the employee population as could realistically be expected to require such a service." *David Nassif Associates v. United States, supra,* 214 Ct.Cl. at 431–32, 557 F.2d at 263.

There was much evidence offered on this issue in the case; more perhaps, than was necessary. Having considered it all, the court concludes that a cafeteria sized to accommodate 320 seats represents a fair and realistic balance between the competing interests involved. To explain this result, it is unnecessary to recount all that was said on the subject. (The accompanying findings cover that aspect of the case in full.) Rather, it is in order here, to identify the basic propositions upon which the court's conclusion is based.

The starting point is with the basic contention upon which plaintiff has centered its case: that competition and demand factors considered, the operation of a profit-oriented cafeteria in the Nassif Building represented, at best, an economically questionable undertaking and thus one which, from a risk-minimization standpoint, dictated a cafeteria sized to conservative demand and square foot requirements.

The essential correctness of this basic proposition—one repeated by nearly all of plaintiff's experts—stands unchallenged in the record. More than that, it finds abundant confirmation in the operating results of the several Government-subsidized cafeterias in existence in the same market area. In 1969, and apparently still the case today, these cafeterias stood in a severe loss posture, this despite the fact that they operated free of utility, rent and special equipment expenses. It was the view of one of plaintiff's experts that, in order for the Government cafeterias to reach the borderline of profitability, their participation levels (meaning, the percentage of in-house employees utilizing the cafeterias) would have to reach the 60 to 80 percent level. No one contends that such a figure represented even a remotely possible attainment for the Nassif cafeteria. To the contrary, it could be easier said that the Government's own experts were inclined more to the views held by plaintiff's experts for their own final recommendation, while much higher than plaintiff's (750 seats versus approximately 300 seats), nevertheless represented a significant retrenchment from the demand and seating requirements that would result from an application of the same GSA guidelines used in the structuring of the aforementioned Government cafeterias.

At any rate, accepting, as the court does, the soundness of plaintiff's orientation to the matter of cafeteria sizing, there are then two further points that fit with it. First is the acknowledged fact that a profit-oriented cafeteria in the Nassif Building would be exposed to a significant competitive disadvantage because of the occurrence of Government-subsidized cafeterias in the

**8**

same market area. The difference in the governing economics of the two operations would compel a difference in their food pricing and this, it was conceded, would have a pronounced adverse impact upon the likely patronage level of the Nassif cafeteria. Although the extent of this adverse impact was not quantified, nevertheless, one could reasonably infer from it a projected patronage level for the Nassif cafeteria that would not reach beyond the average participation experienced at the two most proximate competing facilities—the Government cafeterias located in the HUD Building and in the GSA Regional Office Building. These two buildings—comparable in size to the Nassif Building (over 4,000 employees) and located directly across the street from that building (a less than 5-minute walk)—experienced an average daily luncheon patronage in 1969 of 34.5 percent of the building population. It is this figure then which marks the starting point for the size approximation of a Nassif Building cafeteria.

Beyond the matter of their comparability of size and proximity of location (both being factors which some of the experts saw as especially relevant in affirming the use of these buildings' patronage factors) the more important point here is that both the GSA and the HUD cafeteria were operating at less than their planned-for participation level and therefore contained excess or idle seating capacity. Conservatively estimated, that figure, when measured over the course of the luncheon period, came to 886.5 seats. And it is this consideration which brings to the fore the second point upon which the court has relied.

Given the existence of this excess seating capacity so proximately located, it is reasonable to include that capacity in the equation for determining the seating requirements

for the Nassif cafeteria. In fact, this very approach was one among the several approaches which the Government's experts used in their evaluation of the cafeteria's required seating. The testimony refers to it as the "unmet demand" approach or the "equilibrium among proximate facilities" concept; it is based upon the premise that the total potential patronage within a given market area will distribute itself equally, that is, to the extent of allowable seating, among comparable facilities proximately located. If, as this theory holds, a redistribution of patrons would occur given comparability of service and pricing (the unmet demand of the Nassif Building cafeteria would absorb the excess seating at the HUD and GSA buildings) then the same result would certainly occur if the competing facilities offered comparable food at lower prices. Accordingly, as a matter of good business sense, it would follow that the initial patronage projection for the Nassif Building cafeteria, the 34.5 percent factor identified previously, would require a downward adjustment in recognition of the excess seating capacity occurring in the HUD and GSA cafeterias. Without attending at this point to any of the specifics (all of which are comprehensively detailed in the findings), what this adjustment translates into is a requirement for a cafeteria designed for the accommodation of 1,356 lunch patrons and this, in turn, by the application of various additional factors conventional to the industry (again, this draws upon material covered in full in the findings), spells out a final requirement for a cafeteria of 320 seats. (For ease of reference, there is incorporated into a footnote the step-by-step demonstration of the mechanics involved in the overall determination.[1])

1. *Computation of Cafeteria Seating Requirements —*

(i) 6,500 (building population) × 34.5 (participation factor) = 2,242.5 (total seating requirement).

(ii) 2,242.5 (total seats) – 886.5 (excess or idle seating) = 1,356 (adjusted seating requirement).

(iii) 1,356 (adjusted seating) ÷ 2 (peak loading factor) = 678 patrons during hour of maximum demand.

(iv) 678 (peak load) ÷ 2.5 (hourly turnover rate) = 271.2 required seats at peak period.

(v) 271.2 (maximum required seating) × 1.18 (15% vacancy factor to adjust for inefficiency in seating use) = 320.

By way of additional specification this too should be noted. As herein discussed, the seating requirements for the Nassif cafeteria have been determined, in part, on the basis of the excess in projected demand being accommodated through the utilization of the excess seating capacity of proximate facilities. The full satisfaction of that "equilibrium" approach to demand fulfillment necessarily dictates that the Nassif cafeteria meet the essential requirement of comparability: it must be a full-service cafeteria maintaining a schedule of hours meeting those occurring at the proximate facilities.

One final word is in order. The conclusion reached by the court in regard to the seating requirements and operational character of the Nassif cafeteria though favoring, in the main, the result urged by plaintiff, yet proceeds upon an analysis that is the court's own. The truth be known, neither side offered a comprehensive rationale for the positions that each had urged. Given the direction of the proof suggested in Nassif I, what had been expected was evidence that would demonstrate with some measure of certainty, the interaction, at various levels, between demand projections and profit expectations. Such proof was barely touched upon in plaintiff's case and, by the Government, not at all. Rather, the proof focused almost entirely on competing estimates of demand; hence, the rationale offered in support of the court's conclusion was bound to follow the same limited approach. Should either side now see itself burdened with an unrealistic cafeteria requirement, the answer is simply that the proof did not convince otherwise.

B. *Cafeteria Size: Square Footage Requirements.* In the findings of fact relevant to this issue, it is noted that the per-seat space requirements recommended by the experts ranged from a low figure of 26.7 square feet to a high of 30.8. The evidence made it plain that these size requirements, as well as any falling between them, represented reasonable estimations when evaluated in light of industry norms. The findings adopt 28 square feet per seat as an appropriate standard for application

in this case. That figure results in a total space requirement of 8,960 square feet for a 320-seat cafeteria, and this number, for ease in later use, is rounded to 9,000 square feet. It is intended that the 9,000 square feet should represent net useable space.

C. *Plaintiff's Damages: Excess Cafeteria Construction Costs.* The 800-seat cafeteria that was installed in the Nassif Building comprised approximately 22,000 square feet and involved a total expenditure, on the part of Nassif Associates, of $596,653.95. The cafeteria size had been determined by the Government alone and, as earlier explained, pursuant to an agreement which left the final resolution of the issue (*i. e.,* whether a cafeteria was contractually required and, if so, what size) to later litigation. Accordingly, the parties now agree that the Government is liable for the difference in cost between the cafeteria that was installed and, as herein determined, the cafeteria that should have been installed.

What the parties do not agree upon is the basis upon which this cost difference should be measured. That is to say, the Government maintains that the difference should be determined on the basis of 1969 construction costs for that, it is argued, is the year during which Government occupancy of the Nassif Building commenced; hence, the year in which the cafeteria should have been built and its operation begun. Plaintiff, on the other hand, insists that 1971 is the relevant base year because this not only coincides with the year during which the cafeteria became operational but, more importantly, because the facts of the situation precluded the existence of a cafeteria at any earlier date—at least according to plaintiff's view of them.

What is at stake in this squabble is not the abstract question of which year is controlling, 1969 or 1971. Rather, the real issue is which party should absorb the escalation in construction costs of roughly 12 to 15 percent that occurred over the course of the 2-year period in issue. (In the findings, this indicated inflation rate is computed to be 6.53637 percent annually.)

That being the nub of the problem, the initial answer is that neither side's position is wholly right. Taking first the Government's side of it, its insistence upon 1969 as the base year for measurement overlooks the fact that, up to the time of the supplemental agreement (January 1970), the absence of a cafeteria in the Nassif Building was as much its fault as plaintiff's for it was, after all, a mutual oversight in their lease agreement that precipitated the months of later uncertainty and delay that characterized the cafeteria obligation. Since it was not until January 1970, that that obligation took on any definite and enforceable form (in the supplemental agreement), there is no plausible basis for saying that plaintiff alone should shoulder the escalation in construction costs that occurred prior to that time. The delay in the definitization of the cafeteria obligation was the parties' joint doing and the extra costs that it entails should be shared equally.

As to the increase in costs that occurred after the signing of the supplemental agreement, there is no basis in this record for leaving them other than where they now are: with plaintiff. As subsequent discussion will bring out (see Section E, *infra*, concerning liquidated damages), plaintiff's argument that the cafeteria could not have been built and made operational prior to 1971 omits answering the essential question: whether the several factors, construction and otherwise, that delayed the operational date of the 800-seat cafeteria for nearly a full year beyond the September 1, 1970, opening date contemplated in the supplemental agreement were without plaintiff's fault or negligence. That question remains unanswered in the record; hence, there is no basis now for endorsing plaintiff's position that 1971 should be the reference year for damage purposes.

To sum up, 1970, the year in which the supplemental agreement was signed, becomes the reference point for cost evaluation. Cost increases occurring prior thereto are to be borne equally; cost increases occurring thereafter are for plaintiff to absorb. The net of it is that plaintiff is due the dollar difference between the cost of the 800-seat cafeteria (measured at 1970 construction costs) and a 320-seat cafeteria (measured at the mid-point of 1969–70 construction costs). Based upon cost data developed in the accompanying findings and identified in the steps referenced by footnote,[2] the final number is $331,225.69.

D. *Plaintiff's Damages: Lost Rental Income Attributable to Excess Cafeteria Space.* The second element of plaintiff's claim for damages is based on the lost rental value of the excess cafeteria floor space, *i. e.*, the difference in square footage between the cafeteria it was contractually obligated to install (the 9,000 square foot cafeteria as herein determined) and the cafeteria it was obliged to install under the terms of the supplemental agreement (this, for rent computation purposes, encompassed 20,893 square feet). The Government resists this claim, not on conceptual grounds, but on what it sees as the absence of any evidence in the record that the space in question could have been rented for the period corresponding with the cafeteria lease.

It is true that the record does not say with a certainty that Nassif Associates had another tenant "waiting in the wings" ready to take over the space were it not to be used for a cafeteria. However, the record does say with a certainty that, as of 1970, the year in which the supplemental agreement was signed and the space, therefore, contractually committed, the highest and best use of that space was for first-class storage for which the going market rate was then $2.30 per square foot. Additionally, the more important point here is

2. *Computation of Excess Cafeteria Construction Costs* —

   (i)   $560,047.19 — Total cost of cafeteria as built adjusted to 1970 prices ($596,653.95 × 100/106.53637)

  (ii)  $228,821.50 — Total cost of 320-seat, 9,000 square foot cafeteria based on average of 1969 price of $221,580 and 1970 price of $236,063

 (iii)  $331,225.69 — Excess construction costs due plaintiff

that the record also establishes that, beginning in 1970–71 and continuing over the years of the cafeteria lease-hold, there occurred an ever-increasing demand for building space in the L'Enfant Plaza area (the Nassif Building's location) so that, by late 1974 or early 1975, the highest and best use for the space was for "service-type office" quarters which then commanded a rental rate between $3.50 and $3.75 per square foot.

This evidence is plainly enough to sustain plaintiff's present demand. The record leaves no doubt that, if the space had not been rented in early 1970 for first-class storage use at $2.30 per square foot (this being the use and dollar value on which plaintiff's claim is based), it would most certainly have been rented, say, by 1971, and then for a higher rate. It might also be added that, insofar as the measurement of damages occasioned by delays in the use of property are concerned, contract law does not always insist upon proof of loss to a reasonable certainty; it is clearly permissible to allow recovery to rest upon the fair rental value of the property. Restatement (Second) of Contracts § 362(1). Comment b (Tent. Draft No. 14, March 1979). By any perception of the evidence then, this last—the fair rental value of the property—has clearly been shown.

In relegating unto itself the authority to unilaterally determine the size of the cafeteria in the Nassif Building when, in fact, the parties' basic agreement (the lease contract) had not particularized that point nor given the Government the right to do so, the Government thereby assumed the distinct risk, now materialized, that its judgment might turn out to be wrong. The contract, reasonably construed, does not sanction an 800-seat cafeteria, nor the square-footage requirements that went with it. Accordingly, in addition to the excess construction costs (previously determined) there is also due plaintiff the fair rental value of the excess floor space. This is to be measured at $2.30 per square foot (the fair rental for first-class storage space) from January 14, 1970 (the date the space was contractually committed by the supplemental agreement) through August 31, 1976 (the date the cafeteria ceased operation) less (i) that part of this period during which there were avoidable, *i. e.*, non-excusable, delays in the commencement of construction which postponed the agreed-to operational date of the cafeteria from September 1, 1970 to August 9, 1971 and (ii) that portion of the total rent received by plaintiff from the cafeteria operation that, on the basis of a square foot allocation, is assignable to the excess floor space. As shown by the computation explained in a footnote, the final number is $75,038.87.[3]

E. *Defendant's Counterclaim: Liquidated Damages.* The parties' supplemental agreement provided that the 800-seat cafeteria would be "available as soon as possible and in any event no later than September 1, 1970." The agreement also stated that "[f]or every day on and after November 1, 1970, for which the cafeteria is not fully available, Nassif shall pay to the United States $100 per day as liquidated damages." The cafeteria did not become operational until August 9, 1971, almost a year later than promised. By rent deductions, the United States recovered liquidated damages in the amount of $18,100 for that part of the delay period extending through April 30, 1971. The recovery of the balance still owing, $10,000 (the collection of which the United States had agreed to postpone for a time), is the subject of the Government's first counterclaim in this suit.

---

3. *Computation of Fair Rental Value of Excess Cafeteria Floor Space*

| | | |
|---|---|---|
| (i) | $ 27,353.90 | Annual rental value of excess floor space ($2.30 × 11,893 sq. ft.) |
| | × | |
| (ii) | 6.6301369 | Rental period: January 14, 1970—August 31, 1976 (shown in years) |
| | = | |
| (iii) | $181,360.10 | |
| | Less | |
| (iv) | $ 25,630.23 | Rental attributable to delay period: September 1, 1970—August 9, 1971 ($27,353.90 × 342/365) |
| | Less | |
| (v) | $ 80,691.00 | Amount of total rent received allocable to excess floor space ($141,753.73 × 11,893/20,893) |
| | = | |
| (vi) | $ 75,038.87 | Amount due plaintiff |

We reject the arguments offered in opposition to any recovery of liquidated damages at all. The first of these contentions argues that the provision for liquidated damages should not be enforced on the ground that the supplemental agreement as a whole was the product of duress. The same contention was advanced in Nassif I and was there implicitly rejected; the conclusion is still the same.

■ To render an agreement voidable on grounds of duress it must be shown that the party's manifestation of assent was induced by an improper threat which left the recipient with no reasonable alternative save to agree. Restatement (Second) of Contracts § 317 (Tent. Draft No. 11, April 1976). Contemporary case law has expanded the concept of improper threat beyond the categories first recognized, namely, threats to commit a crime or a tort; now also included are threats that would accomplish economic harm. Restatement (Second) of Contracts § 318, Comment a (Tent. Draft No. 11, April 1976); *Johnson, Drake & Piper, Inc. v. United States*, 209 Ct.Cl. 313, 531 F.2d 1037 (1976); *Aircraft Associates & Mfg. Co. v. United States*, 174 Ct.Cl. 886, 357 F.2d 373 (1966). Such forms of economic duress, or, as it is sometimes also called, business compulsion, include threats that would breach a duty of good faith and fair dealing under a contract as well as threats which, though lawful in themselves, are enhanced in their effectiveness in inducing assent to unfair terms because they exploit prior unfair dealing on the part of the party making the threat. Restatement (Second) of Contracts ¬§ 318(1)(d) and § 318(2)(b) (Tent. Draft No. 11, April 1976).

■ The supplemental agreement exhibits none of these prohibited attributes. To begin with, it is even questionable whether that agreement manifested any unfairness in the sense here relevant. The agreement intended, and accomplished, nothing more than a temporary solution to antagonistic positions; it did not irretrievably bind plaintiff to the Government's interpretation of the contract but, instead, left the final solution of the parties' controversy to litiga-tion. In short, the agreement foresaw no harm that could not later be undone.

Beyond that, no improper threat induced its making: the Government had every right to threaten to postpone its own performance—the planned occupancy of the Nassif Building—in the face of what it saw (and correctly so) as a repudiation by plaintiff of a material part of the parties' bargain, namely, the lessor's obligation to provide eating facilities in the Nassif Building. Restatement (Second) of Contracts § 262 (Tent. Draft No. 8, March 1973); Restatement (Second) of Contracts § 275(1) (Tent. Draft No. 9, April 1974). In such circumstances, the assertion of a legitimate contract right cannot be considered as violative of a duty of good faith and fair dealing.

Nor does it discolor the supplemental agreement any to point out that the Government had made an independent promise to assume early occupancy, that is, on a floor-by-floor basis, in return for plaintiff's interim funding and installation of certain additional equipment in the building. That these added expenditures (totalling approximately $1,700,000) may have heightened plaintiff's financial sensitivity to the threatened loss of rental income and thereby prompted its consent to the supplemental agreement, does not alter the character of the Government's actions. It would twist common sense to say that, on the basis of its independent promise of early occupancy, the Government thereby precluded itself from taking any steps to arrest the erosion of the rights it had bargained for in the underlying lease agreement.

■ Moving to another ground, plaintiff also contends that the delayed installation of the cafeteria caused the Government no damage, either actually or anticipated, and therefore, the liquidated damages provision is simply a penalty clause disfavored on policy grounds and thus unenforceable. This argument too falls wide of the mark.

■ While the enforceability of liquidated damages provisions does depend, in the first instance, on the amount fixed being reasonable in the sense that it must approx-

imate the harm anticipated, it is also recognized that when "the difficulty of proof of loss is great, considerable latitude is allowed in the approximation of anticipated or actual harm." Restatement (Second) of Contracts § 370, Comment b (Tent. Draft No. 14, March 1979). Hence, in a case such as this, where the measurement of the Government's loss due to the delay in the cafeteria operations would be extremely difficult, if not impossible, "it is usually reasonable to establish some fixed monetary substitute for calculation by trial." *Young Associates, Inc. v. United States*, 200 Ct.Cl. 438, 444, 471 F.2d 618, 621 (1973). Apart from the contention that the Government suffered no damages at all (a contention which the court sees as inherently incredible) no reason has been given why the damage figure that was specified here, $100 per day, should not be taken as a fair and reasonable amount.

As another matter, plaintiff alleges the occurrence of excusable delays as grounds for overcoming the assessment of liquidated damages. Among the factors relied upon are the difficulties that plaintiff experienced in initially securing a cafeteria operator after the supplemental agreement had been signed, zoning restrictions that complicated execution of the cafeteria lease and which later led into litigation, licensing difficulties with the District of Columbia Health Department, and, finally, delays on the part of the cafeteria operator in submitting to Nassif Associates the mechanical and electrical plans required for construction. It was the sum of these factors which put off commencement of the cafeteria's construction to a date past the promised operational date of September 1, 1970.

While the court has no doubt that plaintiff pursued the cafeteria matter with diligence (for it was certainly not in its economic interests to do otherwise), this fact does not fill in the proof that is missing here: the need to have shown that the delays encountered had neither been prompted by foreseeable factors nor, at the same time, occasioned by fault or negligence on the part of those involved in the contractual chain. These twin requirements of unforeseeability and freedom from fault or negligence exist here because the supplemental agreement incorporated, by reference, the same standard of excusable delay that governed the parties' basic lease agreement. Under the latter, delays in the completion of the work experienced by the lessor, his contractor, subcontractors, or suppliers would be excusable only if arising from "unforeseeable causes beyond the control and without the fault or negligence" of each of them. The proof fails to satisfy this required standard; hence, the delays may not be regarded as excusable.

The trial judge then concluded, without more, that the total amount of liquidated damages should be allowed. We hold, however, that these damages should be apportioned to reflect the crucial fact that plaintiff was required by the supplemental agreement to build a cafeteria with an 800-seat capacity while this court now holds that a 320-seat cafeteria was all that was required by the lease. In this light we think that the supplemental agreement should fairly be read to call in this case for no more than that portion (*i. e.* 320/800) of the total liquidated damages.

The supplemental agreement expressly envisaged an 800-seat cafeteria. It also contained an all-inclusive "savings" clause, preserving Nassif's position that it was not required under the lease to provide an 800-seat cafeteria or any cafeteria at all.[4] Defendant argues that the supplemental

---

4. This "savings" clause was as follows:

(3) Nassif and the United States reserve all of their rights and remedies, whether administrative, legal or equitable, under the lease or otherwise, and nothing contained in this letter or done pursuant to the agreement in it is intended to waive or abandon such rights and remedies. Nassif further specifically reserves all of its rights and remedies, whether administrative, legal or equitable, to take any action deemed appropriate by Nassif to vindicate any rights or remedies it may have under the lease or otherwise. Nassif advises GSA that it is Nassif's present intent to file an appropriate administrative, legal, or equitable action to test the contention of the parties whether Nassif is obligated to provide a cafeteria in the Building.

14

agreement was a wholly independent contract but the breadth of the "savings" clause shows that this is not so. As we have said above on duress, "the agreement foresaw no harm that could not later be undone." In the face of the expansive "savings" provision we cannot believe that, if this court had held in Nassif I that no cafeteria was required of plaintiff, liquidated damages could still be imposed under the supplemental agreement for delay in furnishing the 800-seat cafeteria. It follows, we think, that, now that we know that a smaller cafeteria had to be provided, a fair interpretation of the agreement is to reduce the liquidated damages proportionately. In that way we give effect to the specific reservation of "all" of Nassif's rights and remedies, including its right not to furnish an 800-seat cafeteria.

In parallel fashion, the presence of this broad "savings" clause, taken together with the explicit requirement of 800 seats, move us not to read the liquidated damages clause as tied solely to the completion of a cafeteria, no matter what its size. The liquidated damages contemplated by the agreement were for the 800-seat size. Similarly to our holdings in other parts of this opinion, it is fair to reduce those damages to meet our present holding that only 320 seats were legally required of Nassif.

The amount of the liquidated damages to be awarded on this basis will be calculated by the trial judge on remand.

F. *Defendant's Counterclaim: Recovery of Condemnation Costs Attributable to Finalized Cafeteria Obligation.* In the facts earlier recited, it was explained that, upon receiving notice of the planned discontinuance of the cafeteria operation in the Nassif Building, the United States filed a condemnation action in the district court on August 30, 1971, to condemn a leasehold on the entire cafeteria space. Thereafter, it contracted with Drug Fair, Inc. to continue the cafeteria operation through the expiration of the condemnation leasehold period—currently, August 31, 1980.

In January 1979, the parties entered into a settlement agreement under the terms of which Nassif Associates received from the United States $458,000 as just compensation for the condemned leasehold for the period September 1, 1976 (the original commencement date), through August 31, 1980 (the present termination date). In addition, the United States incurred costs of $93,998 for utility expenses for the cafeteria for the period September 1, 1976 through April 30, 1978, and $23,604.66 for maintenance and repairs for the cafeteria from September 1, 1976 through January 12, 1978. The United States now seeks the reimbursement of that part of these several expenditures which are identifiable with, that is to say, reasonably allocable to, plaintiff's cafeteria obligation as here defined.

Plaintiff opposes the Government's demand. The argument offered is that on jurisdictional grounds, as well as by the command of *res judicata*, this court is precluded from reexamining an issue that was fully and finally resolved before the district court, to wit: the amount of just compensation that was due plaintiff for the value of the temporary taking. It is said that any attempt to transpose part of the just compensation paid plaintiff into a set-off demand here would, in effect, amount to an undoing of what the district court action had accomplished.

The point is not well taken. The district court action was concerned only with establishing the fair market value of the property condemned. That action did not undertake to determine whether, apart from the fact of the taking, the Government was possessed of a *pre-existing* contractual right requiring plaintiff's dedication, of part of the space taken, to the use and operation of a cafeteria for the Government's benefit. This last is the issue here; it is the enforcement of that contractual right or, more specifically, the damage occasioned by plaintiff's breach, that is the essence of the Government's demand. The issue that plaintiff's argument addresses—the amount of compensation that was paid on account of the taking—figures in the matter only insofar as it serves to establish the baseline from which the Government's damages should be measured.

The fact that the Government finds itself in the somewhat awkward posture of seeking reimbursement of part of the monies it initially paid for the taking is due totally to the circumstances of the case. When plaintiff advised the Government that there would be no cafeteria in the Nassif Building after August 31, 1976, it not only dishonored the supplemental agreement but, in effect, told the Government to fend for itself. The Government, in need of a cafeteria, chose the avenue that it did—it condemned the whole of the existing cafeteria space and contracted for the continuation of the cafeteria operation. It is important to understand, however, that, at the time the condemnation action was brought, the matter of plaintiff's obligation to furnish a cafeteria in the Nassif Building had not been conclusively decided (the final opinion in *Nassif I* was not issued until June 15, 1977); similarly, at the time the condemnation settlement was reached, the cafeteria obligation, though by now established in principle, was still imprecise as to scope because size and seating requirements had not been conclusively determined. Consequently, at each of these times, the Government had nothing more to go by than the size of the cafeteria space temporarily specified in the supplemental agreement. It made as much sense for the Government to accept that temporary measure as the determinant of the space to be condemned than to strike out on its own and fix yet another size for the cafeteria, this possibly no more final than the last.

The point that is to be drawn from all of this is that the condemnation action and the just compensation paid in pursuance thereof, were, like the supplemental agreement itself, simply interim measures necessitated by a twice-occurring circumstance—plaintiff's disavowal of a contractual responsibility to see to the operation of a cafeteria in the Nassif Building. And being no more than interim measures, the rights and obligations that accrued under them, are therefore all subordinate, in the final analysis, to this court's determination respecting the existence, scope and duration of plaintiff's lease-assumed obligation for a cafeteria in the Nassif Building. It follows then, that even as the Government has been called upon here to reimburse plaintiff for those losses attributable to the excess cafeteria size and space, so now also must plaintiff reimburse the Government for that part of the just compensation settlement, and subsequent expenses, that are properly assignable to what, under a more attentively drafted lease agreement, would have been recognized as plaintiff's obligation from the beginning: to provide for and to maintain, without cost to the Government, a 9,000 square foot, 320-seat full-service cafeteria in the Nassif Building.

Accordingly, of the total just compensation payment of $458,000 which plaintiff received, the Government is entitled to the return of $197,290.91, this being the amount allocable to 9,000 square feet.[5]

The same reasons which mandate the repayment of the fair value of the cafeteria space, likewise compel the reimbursement of that part of the Government's out-of-pocket expenses for utility and maintenance charges that are also identifiable with plaintiff's cafeteria obligation. Strictly speaking, the reimbursement of these items of expense should not proceed on a pro rata or square foot basis because a cafeteria, regardless of its size, would have certain energy demands (electricity for cooking and venting) that would remain relatively fixed or, at least, would not move downward by the same proportion that occurs when the cafeteria is reduced from 20,893 square feet to 9,000 square feet. Nevertheless, the Government has noted its willingness to accept reimbursement on a pro rata basis and, for lack of any other reasonable standard to go by, that is the yardstick the court now uses. The Government, having incurred a total of $117,602.66 for maintenance, repair and utility costs on the entire cafeteria space, it is now entitled to the reimbursement of that part of the whole that is applicable to 9,000 square feet,

5. $458,000 × 9,000/20,893 = $197,290.91.

**16**

namely, $50,659.25.[6] Thus, on the entirety of its second counterclaim, the Government is presently due $247,950.16.[7]

It needs to be added too that the utility expenses mentioned here extend only through April 30, 1978; similarly, the maintenance and repair expenses extend only through January 12, 1978. Consequently, whatever additional costs the Government shall incur under either or both of these headings from their present cut-off points through the termination date of the leasehold (August 31, 1980) are also to be borne by plaintiff on a ratable or square foot allocation basis.

### III. SUMMARY

On the basis of the facts and discussion set forth in this opinion, it has been determined that, as part of the parties' lease agreement for the Nassif Building, plaintiff assumed a contractual obligation to provide for and maintain a 320-seat, 9,000 square foot full-service cafeteria in the Nassif Building for the period of the Government's tenancy. On account of the excess construction costs and loss of rental income occasioned by the Government's demand for a cafeteria in excess of this contractual requirement, plaintiff is initially due the sum of at least $406,264.56. The trial judge will determine, in addition, the amount due plaintiff, under this opinion, for liquidated damages already paid to defendant. The trial judge will then determine and total the offsets or counterclaim due defendant for (a) the amount of liquidated damages, if any, still due defendant under this opinion; (b) the amount of excess condemnation costs determined in this opinion (including utility expenses and maintenance and repair costs); and (c) the amount of defendant's pro rata entitlement to utility expenses incurred after April 30, 1978, and maintenance and repair costs incurred after January 12, 1978. The case will be remanded for these calculations and determinations and for the recommendation of the final judgment which automatically follows.

### CONCLUSION OF LAW

On the foregoing opinion and the findings of fact (which are made a part of the judgment herein), the court concludes that plaintiff and defendant are entitled to recover as stated in the above opinion and judgment is entered to that effect. The case is remanded to the trial division under Rule 131(c) for a determination of the amounts due plaintiff and defendant, and final amount, if any, due each party.

---

**6.** $117,602.66 × 9,000/20,893 = $50,659.25.

**7.** $197,290.91 + $50,659.25 = $247,950.16.