Newton G. OSBORNE,
Appellant/Cross–
Appellee,

v.

HOWARD UNIVERSITY PHYSI-
CIANS, INC., Appellee/Cross–
Appellant.

Nos. 04–CV–951, 04–CV–1120.

District of Columbia Court of Appeals.

Argued Jan. 18, 2006.

Decided July 20, 2006.

Ross A. Nabatoff, Washington, DC, for appellant/cross-appellee.

Thomas Hylden, Washington, DC, with whom Dennis M. Taylor, was on the brief, for appellee/cross-appellant.

Before FARRELL, Associate Judge, and BELSON and SCHWELB, Senior Judges.*

BELSON, Senior Judge:

Appellant Newton G. Osborne, M.D., Chairman of the Department of Obstetrics and Gynecology of the College of Medicine of Howard University ("Howard"), sued Howard University Physicians, Inc. ("HUP"), a corporate entity different from Howard, for breach of contract on the basis of HUP's prolonged failure to sign a contractually-required annual revision to Appendix A of his 1995 contract of employment. Appendix A controlled the source and amount of the income Dr. Osborne was entitled to receive from HUP for his clinical, non-academic work. Dr. Osborne challenges on appeal the trial court's finding that he was not acting under duress when he signed a 2003 employment agreement with Howard in which he waived any and all claims against HUP, and its conclusion that HUP was a third-party beneficiary of the 2003 agreement. We affirm.

## I.

On July 14, 1994, Dr. Osborne was appointed to the rank of professor with "in-definite tenure" and Chairman of the Department of Obstetrics and Gynecology of the College of Medicine of Howard University. Howard University agreed to pay Dr. Osborne a $170,000 annual salary for his services as a professor. Separately, Howard agreed to pay Dr. Osborne, through various grants, $100,000 for the period July 1, 1994 through June 30, 1995 for his participation in Howard's faculty practice plan, which provided clinical services to the community. Dr. Osborne agreed to these terms by signing his appointment letter, which stated:

> [Y]our duties and responsibilities as a new Chairman with all the problems in Obstetrics and Gynecology may preclude your earning all of your supplement immediately. As per our custom, this office will advance your supplement for two years even if your duties and responsibilities preclude your earning it. . . . *Acceptance to the College of Medicine faculty confirms that you agree to meet all of the requirements of the College of Medicine's Private Practice Plan. Please contact the Office of Clinical Practice.*

(Emphasis in original.) Dean Charles H. Epps of the College of Medicine later explained to Dr. Osborne that the amount of his supplemental salary would depend on the number of hours he worked and the amount collected by HUP from patient billings. Shortly after he arrived in Washington to begin work, Dr. Osborne contacted the clinical office.

One year later, HUP assumed responsibility for administering the faculty practice plan. To that end, HUP, Howard and Dr. Osborne entered into a new agreement which became effective July 1, 1995. Attached to the new agreement was an Ap-

---

* Judge Schwelb was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on June 24, 2006.

pendix A, pursuant to which Howard agreed to continue paying Dr. Osborne's annual salary of $170,000 and HUP agreed to pay Dr. Osborne $100,000 for his clinical services performed during the period of July 1, 1995, through June 30, 1996. This agreement specified that Appendix A "may be amended only by subsequent written agreement between the parties [and that] it shall be revised annually by execution of the parties."

When the first date for such annual amendment arrived, July 1, 1996, the parties neglected to execute a revised Appendix A. Nevertheless, Dr. Osborne continued to fulfill his academic and clinical services obligations. In late 1996, he received notification that his clinical salary would be decreased.[1] Dr. Osborne contacted the new dean of Howard's College of Medicine, Floyd Malveaux, and requested an explanation for the drastic decrease in his clinical income. Dean Malveaux soon responded, writing that Dr. Osborne's November 1996 salary reduction resulted from "administrative action by HUP management to reconcile expenses with income."

Around this time, Dr. Victor Scott, president of HUP, disseminated several memoranda to the HUP membership explaining that because of financial difficulties, HUP members would not be paid full supplements. He explained that HUP could not meet its payroll obligations, and thus the group had to borrow money from Howard University to cover expenses. In an effort to meet its financial obligations, the HUP board decided that supplemental salaries would be calculated on the basis of the individual physician's collections minus the averaged expenses of HUP allocated to that physician. Dr. Osborne's dissatisfaction with the decrease in his supplemental salary came to a head in 1998, when he began to refuse to accept payment from HUP until the parties agreed on an acceptable method for paying him for his clinical services and, as discussed below, filed a breach of contract action against Howard on November 16, 1998.

Due to the dire financial situation of HUP, and its physicians' increasing dissatisfaction with the amount they received, Howard decided to resume its administration of the faculty practice plan previously administered by HUP. In January 2002, HUP physicians were invited to a retreat to discuss the new faculty practice plan. At the retreat, physicians were encouraged to ask questions about the new plan. Dr. Osborne did so, and the HUP staff directed him to review a pamphlet which outlined compensation policies under the new practice plan—policies that largely mirrored those of HUP. Dr. Osborne later memorialized his objections to the new plan and sent them to the dean.

By letter dated September 16, 2002, Dr. Osborne received a copy of the new Member Practice Agreement, which was to take effect January 1, 2003 ("the 2003 Agreement"), and concedes that he had the opportunity to review it with his counsel. The letter indicated that his continuation as a member of the Howard faculty necessitated participation in the new faculty practice plan. Dr. Osborne was further instructed to sign the agreement and return his copy to the dean by October 11. Dr. Osborne failed to submit the agree-

---

1. In 1997, HUP paid Dr. Osborne a supplemental salary of $36,984.50. The following year HUP paid Dr. Osborne $25,461.91. In 1999, HUP paid Dr. Osborne $499.44 for his clinical services. After 1999, Dr. Osborne refused to accept payment for clinical services he performed. The amounts of Dr. Osborne's salary for the years 1997–1999 were memorialized in yearly statements which set forth the amount billed by Dr. Osborne, the amount collected by HUP, and the share of overhead assessed to Dr. Osborne.

ment by the appointed date. Consequently, the Provost wrote to Dr. Osborne, informing him that Howard had not received the signed agreement and that it was "constrained to conclude that you have elected not to continue your employment as a member of the [College of Medicine] faculty." The letter also instructed Dr. Osborne to vacate his office by December 31, 2002.

Approximately a month later, Dr. Osborne signed the agreement. Under the terms of the 2003 Agreement, he agreed to accept a salary of $197,311 for his academic duties and service as Chief of Gynecology and Chair of the Appointments and Promotional Committee. He further agreed to accept a negative draw in the amount of $12,624 for his clinical services and to release and waive any claims he had against HUP.

## II.

The procedural history of this case dates from November 16, 1998, when Dr. Osborne instituted a breach of contract action against Howard, alleging that it had breached his 1995 employment agreement when it neglected to execute a new Appendix A by July 1, 1996. Subsequently, the court granted Dr. Osborne's request to file an amended complaint adding HUP as a defendant. Howard moved for summary judgment, asserting that it had complied with the terms of the agreement by paying Dr. Osborne $170,000 for his academic services. The trial court awarded summary judgment to Howard, concluding that Howard satisfied its contractual obligations to Dr. Osborne, who has not appealed from that judgment.

Dr. Osborne and HUP then filed cross-motions for summary judgment. Dr. Osborne argued that the 1995 contract unambiguously required HUP to pay him an annual salary of $100,000 unless the parties mutually agreed to a new salary under the terms of 1995 employment agreement. The trial court granted Dr. Osborne summary judgment as to liability because:

> Beginning after July 30, 1996, HUP, unilaterally, and in direct violation of the Agreement's unambiguous terms that require the parties to execute a revised Appendix A and to agree in writing to any amendments to the Agreement, intentionally failed to pay Dr. Osborne $100,000 that was identified in Appendix A.

Accordingly, the court scheduled a hearing on damages.[2]

HUP then moved for reconsideration contending that (1) it had obtained newly discovered evidence in the form of Dr. Osborne's 2003 Agreement with Howard, whereby he released all claims against HUP, and (2) Dr. Osborne's ratification of the new agreement required vacation of the summary judgment award. The trial court denied the motion but ruled that HUP could use the 2003 Agreement as evidence during the trial on damages.

A two-day bench trial followed on the issue of damages during which Dr. Osborne and several HUP administrators testified about the terms of the original employment agreement, the financial condition of the faculty practice group, and the events leading up to the execution of the new contract. The trial judge found that even though Howard had threatened to terminate Dr. Osborne if he did not sign the 2003 Agreement, Dr. Osborne could have chosen not to sign the agreement and

---

**2.** On October 15, 2003, the trial court memorialized in a written order its oral award of summary judgment to Dr. Osborne.

pursued a legal remedy. Therefore, the trial judge concluded, Dr. Osborne did not sign the new agreement under duress. The judge further determined that Dr. Osborne had waived any claims against HUP and found that HUP was an intended third-party beneficiary of the 2003 Agreement, as provided in the release provision, which directly identified and benefited HUP. The court entered a final order and judgment in favor of HUP. Dr. Osborne noted a timely appeal.

### III.

#### A.

We consider first Dr. Osborne's challenge to the trial judge's determination that his 2003 Agreement with Howard was not the product of duress. He contends that Howard improperly threatened him with termination in violation of the explicit terms of both the 1995 employment contract, which required the parties to agree mutually upon any employment-related changes, and in violation of the Howard University Faculty Handbook. He further contends that litigation did not present him, as a tenured employee, with a reasonable alternative to signing the new agreement because while pursuing litigation he would be stripped of his tenure and his job.

█ "What constitutes duress is a matter of law; but whether or not duress existed in the particular transaction is usually a question of fact." *Rizzi v. Fanelli*, 63 A.2d 872, 874 (D.C.1949) (internal citation omitted). We will not reverse a trial court's factual findings unless such findings are clearly erroneous or unsupported

by the record. D.C.Code § 17–305(a) (2001); *Jerome Mgmt. v. District of Columbia Rental Hous. Comm'n*, 682 A.2d 178, 182 (D.C.1996). In his Findings of Fact and Conclusions of Law, the trial judge found it "arguable that Howard did induce ... assent to the release ... by threat to terminate," without deciding whether or not the conduct was improper. The trial judge concluded, however, that since Dr. Osborne had a reasonable alternative to signing the 2003 Agreement, "for example, ... legal action," he could not satisfy the requirements for duress. We agree.

█ Duress is a defense to a contract action. The party who seeks to set aside a contract on this basis can succeed only if he adduces sufficient proof of (1) an improper threat and (2) the lack of a reasonable alternative. *See, e.g., Young v. Anne Arundel County*, 146 Md.App. 526, 807 A.2d 651, 692–94 (Ct.Spec.App.2002). A threat is improper if:

(a) what is threatened is a crime or a tort, or the threat itself would be a crime or a tort if it resulted in obtaining property,

(b) what is threatened is a criminal prosecution,

(c) what is threatened is the use of civil process and the threat is made in bad faith, or

(d) the threat is a breach of the duty of good faith and fair dealing under a contract with a recipient.[3]

RESTATEMENT (SECOND) OF CONTRACTS § 176(1) (1981). If a party establishes the two elements stated above, he may have the contract set aside.[4] RESTATEMENT

---

**3.** Dr. Osborne asserts that Howard's threat of termination breached the implied covenant of good faith and fair dealing imposed by both the 1995 agreement and the Howard University Faculty Handbook.

**4.** However, even upon a showing of duress, the contract at issue is not voidable if the victim has accepted benefits under that contract, thereby ratifying it. *Goldstein v. S & A*

(SECOND) OF CONTRACTS § 175(1); *see also Sind v. Pollin*, 356 A.2d 653, 656–57 (D.C. 1976). Thus, it was Dr. Osborne's burden to demonstrate that Howard improperly threatened him with termination and that he had no reasonable alternative other than to sign the 2003 Agreement. *Ozerol v. Howard Univ.*, 545 A.2d 638, 643 (D.C. 1988); 28 RICHARD A. LORD, WILLISTON ON CONTRACTS §§ 71:10, 71:14 (4th ed. 2003).

We endorsed in *Ozerol* the principles enunciated in the RESTATEMENT, but did not have occasion to discuss them as duress was a collateral issue in that case. 545 A.2d at 643. The United States District Court for the District of Columbia has referred to both prongs of the test for duress enunciated in the RESTATEMENT. *Goldstein, supra* note 4, 622 F.Supp. at 145; *see also David Nassif Assocs. v. United States,* 226 Ct.Cl. 372, 644 F.2d 4, 12 (1981). Several other jurisdictions also have turned to the RESTATEMENT for guidance on the issue of duress. *See, e.g., Vail/Arrowhead, Inc. v. District Court,* 954 P.2d 608, 612–14 (Colo.1998); *In re Marriage of Spiegel,* 553 N.W.2d 309, 318 (Iowa 1996); *United States ex rel. Trane Co. v. Bond,* 322 Md. 170, 586 A.2d 734, 738–39 (1991); *Richards v. Allianz Life Ins. Co. of N. Am.,* 133 N.M. 229, 62 P.3d 320, 328–30 (Ct.App.2002); *Jennings v. Reed,* 381 N.J.Super. 217, 885 A.2d 482, 488–89 (App.Div.2005); *Germantown Mfg. Co. v. Rawlinson,* 341 Pa.Super. 42, 491 A.2d 138, 143–45 (1985); *Drier v. Great Am. Ins. Co.,* 409 N.W.2d 357, 360 (S.D. 1987); *Dallas County Cmty. Coll. Dist. v. Bolton,* 185 S.W.3d 868, 878 (Tex.2005); *Boud v. SDNCO, Inc.,* 54 P.3d 1131, 1137–38, (Utah 2002); *Machinery Hauling v. Steel of W. Va.,* 181 W.Va. 694, 384 S.E.2d 139, 142–44 (1989). We conclude that it is appropriate to apply the RESTATEMENT principles here.

*Rest. Corp.,* 622 F.Supp. 139, 145 (D.D.C.

▇ We begin our analysis with the issue the trial judge found dispositive: whether Dr. Osborne had a reasonable alternative to signing the 2003 Agreement. Dr. Osborne contends that if confronted with a threat to sign a new contract or lose one's job, any tenured employee would have acted just as he did. He seems to suggest that his tenured status somehow differentiates him from other employees required to sign a new contract or face termination. In support of this argument, he cites a host of precedents from other jurisdictions for the proposition that the availability of a legal remedy is not controlling if, given the circumstances, it will not afford effective relief to the party asserting duress.

We have held previously that a legal remedy may represent a reasonable alternative to signing a contract. *See Ozerol, supra,* 545 A.2d at 643; *Sind, supra,* 356 A.2d at 657. Dr. Osborne points out, however, that there are some instances in which litigation has been shown to be an ineffective remedy. But, in the cases on which he relies, the party seeking to avoid the contract proffered evidence of particularized economic harm that would result from choosing termination (and litigation) over signing the contract. *See Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1243 (10th Cir.1990) (remanding case for factual determinations concerning AGI's financial situation at the time it entered into settlement and release agreement); *Capps v. Georgia–Pac. Corp.,* 253 Or. 248, 453 P.2d 935, 939–40 (1969) (reversing and remanding for trial on factual issue whether plaintiff Capps possessed no reasonable alternative to signing agreement offered by defendant, given prospect of immediate foreclosure on his home); *Eulrich v. Snap–On Tools Corp.,*

1985).

121 Or.App. 25, 853 P.2d 1350, 1353 (1993), *vacated by* 512 U.S. 1231, 114 S.Ct. 2731, 129 L.Ed.2d 854 (1994) (evidence supported finding that Eurlich possessed no reasonable alternative to signing unfavorable termination agreement because Eurlich had no resources to pay household bills, his wife was ill and hospitalized and Eurlich had no medical insurance); *see also Louisville Title Ins. Co. v. Surety Title & Guar. Co.*, 60 Cal.App.3d 781, 132 Cal.Rptr. 63, 79–81 (1976) (noting that although Louisville Title may not have had reasonable alternative to signing agreement since it was facing bankruptcy, there was insufficient evidence of improper threat by defendant Surety to support jury's implied finding that agreement should be set aside because of economic compulsion). As these cases illustrate, simply asserting that litigation is an unreasonable remedy is not enough. The assertion must be supported by facts establishing specific financial harm that make litigation an unreasonable alternative.

Accordingly, Dr. Osborne's reliance on this authority is unavailing. During the damages trial, Dr. Osborne failed to present evidence of what, if any, kind of particularized financial hardship he would have suffered had he chosen not to sign the agreement.[5] Thus, Dr. Osborne failed to prove that financial exigencies rendered a legal remedy an unreasonable alternative to signing the new agreement.

More important, the record demonstrates that Dr. Osborne failed to show what there was about his circumstances that rendered a legal remedy unreasonable or ineffective. He insists that his status as a tenured professor creates a circumstance in which litigation represents an unreasonable alternative. However, he offers no explanation as to why this is so. Nor has he offered authorities supporting the position that monetary damages, perhaps combined with other relief, cannot adequately compensate one for the loss of a tenured position. Moreover, even if we were to assume that an award of damages could not adequately compensate one for the loss of a tenured position, we note that Dr. Osborne fails to demonstrate why in that case injunctive relief would not be a reasonable alternative to his signing the 2003 Agreement.

Absent proof of circumstances eliminating litigation as an effective remedy, Dr. Osborne had several alternatives to signing the new agreement: (1) he could have invoked the faculty handbook procedures governing termination;[6] (2) he could have filed suit asking a court to enjoin his termination until the requisite handbook procedures were followed; or (3) he could have quit and sought employment elsewhere. In sum, Dr. Osborne failed to affirmatively demonstrate, as was his burden, that his circumstances made a legal remedy an ineffective alternative to sign-

---

**5.** In fact, the evidence suggests that Dr. Osborne was not in a position of economic hardship during late 2002. By the time Howard presented him with the 2003 Agreement, Dr. Osborne had been consistently refusing to accept payment from HUP for his clinical services. Furthermore, there is no evidence or claim that, at any time before he signed the 2003 Agreement continuing his employment, Dr. Osborne had not been paid the $170,000 salary for his academic services.

**6.** Dr. Osborne could have undertaken to use the grievance procedure outlined in the handbook even though HUP does not concede that Dr. Osborne would be entitled to a hearing or other procedural safeguards under the faculty handbook had he refused to sign the new agreement. Rather, HUP contends that Howard would have possessed "just cause" to fire Dr. Osborne because participation in a faculty practice plan was an original condition of his employment that was not superseded by the terms of the 1995 agreement executed by Dr. Osborne, Howard, and HUP.

ing the new agreement. Thus, we are not persuaded that the trial court erred in its determination that Dr. Osborne failed to prove duress, and that accordingly he could not successfully call upon the court to set aside the 2003 Agreement on that basis.

In light of its ruling that Dr. Osborne did not act under duress given the reasonable alternative available to him, the trial court did not reach the question of whether Howard's statement to him that it intended to terminate his employment as a member of the College of Medicine faculty if he did not sign the 2003 Agreement constituted an improper threat. *See* RE-STATEMENT (SECOND) OF CONTRACTS § 176(1). We agree that it was unnecessary to reach that issue.

**B.**

■ Dr. Osborne also challenges the trial court's determination that HUP was an intended third-party beneficiary under the terms of the 2003 Agreement between him and Howard. In support of his argument, he cites a general proviso in this agreement which provides that "[i]t is the explicit intention of the Parties hereto [Dr. Osborne and Howard] that no person or entity other than the Parties hereto is or shall be entitled to bring any action to enforce any provision of this Agreement against either of the Parties...." The trial judge rejected this argument, citing the more specific release provision which states: "Member hereby releases, waives, and compromises any and all rights, claims and causes of action that the Member has or had ... arising out of any previous faculty practice plan ... including Howard University Physicians, Inc." Accordingly, he ruled that HUP was an intended third-party beneficiary "because the terms of the release directly benefitted HUP and

because HUP was specifically identified for those benefits."

This court resolved a similar question in *Woodfield v. Providence Hosp.*, 779 A.2d 933 (D.C.2001). In that case, Woodfield, a registered nurse, signed a release stating that she authorized Suburban Hospital to investigate her background as part of its application process. Woodfield's previous employer, Providence Hospital, in keeping with its employee manual, followed a usual policy of limiting employment verification to confirmation of the employment dates and positions held. When contacted by an employment verification service retained by Suburban, however, Woodfield's supervisor related that her job performance had been poor. As a result of this performance review, Suburban Hospital retracted its offer. *Id.* at 936. Although Providence Hospital was not identified by name in the release signed by Woodfield, we determined that Providence was an intended third-party beneficiary for two reasons: (1) the terms of the release directly benefited Providence Hospital; and (2) the release provision identified the intended beneficiaries as those entities or individuals named in Woodfield's job application— Providence Hospital and Woodfield's supervisor. *Id.* at 937.

The instant circumstances are analogous to those in *Woodfield,* but even more strongly support a conclusion that HUP was covered by the release. First, the release provision here specifically named HUP as an intended beneficiary. Second, it is clear that the release provision was intended to benefit HUP because in it Dr. Osborne explicitly waived any past or present claims arising from his relationship with HUP. We reject Dr. Osborne's contention that the general proviso was controlling. Specific terms should be preferred over general language when interpreting conflicting provisions of a contract.

Restatement (Second) of Contracts § 203(c). Therefore, we hold that the trial court did not err when it ruled that HUP was an intended third-party beneficiary of the 2003 Agreement. *Woodfield, supra,* 779 A.2d at 937.

## IV.

The trial court correctly determined that Dr. Osborne's execution of the 2003 Agreement was not the product of duress. Under its terms, Dr. Osborne waived his breach of contract claim against HUP, and accordingly the trial court could award no damages to Dr. Osborne. Because HUP limited its cross-appeal to challenging the summary judgment awarded Dr. Osborne as to liability only in case of a reversal of the damages determination in its favor, we need not review that award of summary judgment to Dr. Osborne.

*Affirmed.*